No. 94-019

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN RE THE MARRIAGE OF

CAROL J. ALLISON, n/k/a CAROL L. AMICK,

      Petitioner and Respondent,

  and

BRUCE E. ALLISON,

      Respondent and Appellant.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Randall S. Ogle, Ogle & Worm,
Kalispell, Montana

      For Respondent:

          Bruce McEvoy, Warden, Christiansen,
Johnson & Berg, Kalispell, Montana

**FILED**

DEC 23 1994

Filed:

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:   September 22, 1994

Decided:   December 23, 1994

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

On July 29, 1991, Bruce Allison filed an ex parte motion to change residential custody of the parties' children from Carol Amick to himself, alleging that the Department of Family Services confirmed that the children had been abused and neglected by Carol. The Eleventh Judicial District Court, Flathead County, granted temporary residential custody to Bruce during the pendency of the instant proceedings. A number of hearings were conducted over the course of two years: October 16, 1991, June 4, 1992, July 13, 1992, March 30, 1993, and July 29, 1993. At the close of the July 29, 1993, proceedings, the District Court ordered the parties to submit proposed findings and conclusions by August 13, 1993. On December 9, 1993, the District Court issued findings, conclusion, and judgment returning residential custody of the parties' two children to Carol. Bruce appeals. We affirm.

We frame the issues on appeal as follows:

1. Was there sufficient evidence to support the District Court's findings of fact and conclusions of law maintaining Carol as primary residential custodian of the parties' children?

2. Did the District Court err by adopting findings and conclusions substantially similar to Carol's proposed findings and conclusions?

3. Did the District Court properly conclude that the July 29, 1991, ex parte order changing residential custody was improperly issued, and therefore, should be vacated?

2

The parties' marriage was dissolved on November 9, 1990. The parties were awarded joint custody of their two children, J.A. and C.A., with Carol designated as residential custodian. At the time of the dissolution, Carol's two children from a previous marriage, R.E. and T.E., also resided with the parties. Following the dissolution, the parties resided together until late January or early February 1991, when Carol and the children moved out.

On February 5, 1991, the Kalispell office of the Montana Department of Family Services (DFS) received an abuse and neglect referral from a school counselor at R.E. and T.E.'s school. DFS opened an investigation into the matter on February 13. The school counselor felt that Carol required counseling. A social worker attempted to contact Carol, and left several messages for her to call the DFS office.

On March 19, Carol called and set up an appointment to meet with a social worker the following day. Later that day, DFS received a call from the school counselor reporting that R.E. had appeared in school with a bruise on his face. Brad Custer, a DFS social worker, interviewed T.E. and R.E. R.E. reported that he had been slapped on the head by his mother for no apparent reason.

On March 20, Carol came to the DFS office for her appointment. According to Custer, Carol admitted slapping R.E.'s face because she was frustrated with his uncontrollable behavior. Carol testified at trial that R.E. was cussing at her, "calling [her] every name in the book," and she slapped him across the face. Carol also told Custer that she had been the victim of physical,

3

sexual, and emotional abuse both as a child and during her marriage to Bruce, and that she was co-dependent. Carol agreed to work with the school counselor and with a family counselor, and she agreed to participate in a co-dependency treatment program.

On March 28, Carol and a friend returned to the DFS office. Custer reiterated that Carol must seek counseling. Custer advised Carol that her slapping of R.E. had been substantiated as physical abuse. Custer recommended that Carol refrain from physically disciplining her children, and that she contact a local program for parenting education and alternatives to physical discipline. Carol and Custer developed a treatment plan and agreed that Carol would undergo a mental health evaluation and would follow through with the recommendations made following the evaluation.

In early April, Carol sent R.E. to live with his natural father in Canada. On April 9, Bruce telephoned the DFS and stated that he would go to court, if needed, to resolve what he felt was a worsening situation.

In early May, Carol went to psychologist Herman Androes for a mental health evaluation. Androes reported to DFS that Carol was following through with the process, and that the results of the evaluation looked very good for her.

A DFS intake referral form dated June 10, 1991, completed and initialed by Eva Jo Burrington, states that Bruce's live-in girlfriend, Barbara Dietz, called the DFS office. Barbara stated that she thought that the school had reported Carol for abuse and neglect. She expressed concerned about J.A.'s increasingly

4

sexualized behavior--including open-mouthed kissing, unzipping other people's clothing, and attempting to touch other people's genital areas--during his visitation with Bruce, Barbara, and Barbara's two teenage sons. Burrington noted that Barbara was "very concerned that we understand this is not a custody dispute [but] are real concerns."

On June 18, Custer transferred Carol's case to Ann Anderson, another DFS social worker. He noted that the investigation was closed, that the reported abuse--the slapping of R.E.--had been substantiated, and that he estimated the future risk of abuse at an intermediate level.

On or about July 1, Bruce moved the District Court to order DFS to disclose its confidential reports regarding Carol. The motion was granted without notice to Carol and without a hearing. Anderson complied with the order, and on July 9, provided the District Court with copies of DFS records regarding Carol. In her cover letter, Anderson informed the court that the DFS investigation into the matter was ongoing and that she would provide copies of any updates.

On July 17, Anderson visited J.A. and C.A.'s daycare center. The daycare workers stated that they had not noticed any aggressive or sexual behavior on J.A.'s part. Anderson returned on July 30 to interview J.A. She reported that: "He was a little nervous when asked about secrets and the secret seems to relate to his brother [R.E]. He did not show any changes in affect when questioned about private parts or secret touching."

5

On July 29, 1991, Bruce filed an ex parte motion to change residential custody from Carol to himself, alleging that DFS had confirmed that the children had been abused and neglected by Carol. The court granted temporary residential custody to Bruce.

On September 4, 1991, Anderson wrote the District Court to update the record. Her letter stated that DFS had completed its investigation into the allegations of sexual abuse and that the allegations had not been substantiated. She told the court that Carol had been psychologically evaluated, and she recommended that Bruce also be evaluated "before decisions are made regarding custody of the children." The record reveals that, to date, Bruce has not undergone a full psychological evaluation.

On September 24, Carol moved the District Court to refer the matter to Family Court Services (FCS) of the Eleventh Judicial District for further investigation. The court granted the motion and ordered FCS to investigate and submit a report by November 1.

On October 10, Bruce filed a motion for the production of Carol's psychological evaluation. In response, Carol moved the court to order Bruce to submit to a psychological evaluation. A hearing on the motions was held on October 16, and the court issued an order on October 25 granting both motions.

On November 1, Thomas Best, the current director of FCS, submitted a report to the court. He stated:

> It appears the single parenting stress of raising four children overwhelmed CAROL ALLISON. My conference with BRUCE ALLISON did not reveal a[n] angry father waiting on the sidelines to grab [the] children at the first

> opportunity. He appears to have genuine concerns for the welfare of [J.A.] and [C.A.] . . . .
>
> I would recommend the continuation of the joint custody . . . but the residential responsibility for the children . . . be with their father.

On November 6, 1991, the parties stipulated that Bruce would maintain temporary residential custody for an additional six months while Carol and the children received counselling. In December, FCS made arrangements for the children's visitation exchange to take place at the FCS offices. FCS made the arrangements because Bruce's girlfriend had expressed fear at meeting with Carol to exchange the children.

In early January 1992, Bruce and his girlfriend continued to phone DFS, insisting that they reopen the sexual abuse investigation. On January 23, Bruce refused to allow Carol visitation, and the Sheriff's Department intervened and assisted Carol in obtaining the children. Jolie Arnold, the new director of FCS, advised Bruce to contact Maxine Lamb at the Sheriff's Department and file a report if he had serious concerns regarding abuse. Arnold later contacted Lamb to discuss the situation, and Lamb said that Bruce stated he would not come in to see her because he could not get off work.

On January 27, Anderson petitioned the court for temporary investigative authority of J.A. and C.A. Anderson thought that if the DFS personnel could observe J.A. and C.A. for one week in a neutral environment, they could determine if the children were exhibiting signs of abuse. Bruce protested. Rosemary McKinnon,

J.A. and C.A.'s counselor, phoned Anderson. McKinnon stated that she had been seeing the children every three to four weeks since August 1991 and that she felt they were doing better with Bruce. While she had not been able to substantiate any sexual abuse, McKinnon stated that Bruce and his girlfriend were reporting an increase in sexualized behavior. She felt that removing the children would be traumatic for them. Neva Yourman, the children's daycare supervisor, also contacted Anderson. Yourman reported that J.A. and C.A. were at the daycare center full-time and that, although Bruce's girlfriend reported that the children had been inappropriately touching others, they had not displayed any inappropriate behavior while at the daycare.

The District Court denied DFS's petition for temporary investigative authority. Anderson requested that Bruce come into the office without his mother or girlfriend. Anderson outlined to Bruce three options for pursuing the investigation of the allegations of sexual abuse: (1) Have the children continue counselling with Rosemary McKinnon "with the idea that she would elicit some disclosure" of sexual abuse from the children; (2) have a law enforcement official interview the children and attempt to elicit a disclosure; or (3) allow the DFS to observe the children in a neutral setting. Anderson explained to Bruce that she did not believe, based on her ongoing investigation, that the children had been sexually abused in their mother's home. Anderson reported that "Bruce said Carol's on-going sexual abuse as a child is the reason for his concern about sexual abuse of his children."

On February 7, 1992, Anderson closed her investigation into the allegations of sexual abuse. She concluded that the allegations were not substantiated and that the risk of future abuse was low.

On March 9, 1992, Bruce and his girlfriend took C.A. and J.A. to the Kalispell Police Department and filed a report of suspected child abuse with Sergeant Lanfear and Officer Bardwell. The officers observed faint bruising on both children's necks, but reported that the bruising was faint enough that they did not attempt to take photographs. The children would not speak to the officers, but Bruce informed them that the children had stated that their mother had choked them. Bruce and his girlfriend both gave written statements implicating Carol.

DFS received the police report on March 10 and a new investigation was opened. Anderson contacted Arnold at FCS. Arnold reported that, on the morning of March 9, when Carol brought the children to the FCS office to make the exchange following their weekend visitation, she had checked the children and had not noticed any bruising. Anderson also called Neva Yourman at the daycare center. Yourman reported that the children did not have any bruising when they were brought to the daycare by Bruce's girlfriend.

Anderson called the police department. Sergeant Lanfear told her that Carol had given a statement and had denied the allegations. Carol asked to be given a polygraph examination. The test subsequently was administered, and the results were in her

favor. DFS closed the investigation into the March 9 allegations of abuse, concluding that abuse had not been substantiated and rating the risk of future abuse as being low.

On May 14, 1992, Carol moved the District Court to modify or clarify the custodial, residential, visitation, and financial arrangements related to the parties' children.

About the same time, McKinnon sent a letter to Arnold. McKinnon stated that she was writing at Bruce's request. She explained that she had seen the children 13 times since August 1991. She recommended that Carol be limited to supervised visitation. On May 20, McKinnon sent Arnold a follow-up letter which stated in pertinent part:

> Since my letter to you on May 12, [J.A.] spontaneously reported to his father and subsequently to me that when his mother is angry with him she squeezes his penis. This new finding is, of course, a very serious one, which will be reported to Social Services for further investigation. It underscores my concern for the welfare of both children when they are in the care of their mother and I hope that you will give serious consideration to my recommendations as outlined in my May 12 letter.

On June 2, 1991, Anderson opened a new investigation into the penis squeezing allegations. According to the DFS records, Bruce had complained to Warren Wright, western regional director of DFS, about the local DFS office's handling of the case. Wright contacted the local office and informed them of the latest allegations. Although Bruce believed that Wright would remove Anderson from the case, Wright contacted Anderson by phone and

10

informed her that she would, in fact, continue to facilitate the investigation.

On June 3, 1992, Bruce moved the District Court to require that Carol's visitations with the children be supervised. The District Court granted the motion for supervised visitation. That same day, Anderson requested that the Kalispell Police Department investigate the penis squeezing allegations. Carol volunteered to submit to a polygraph test, and the results were in her favor. Interviews with the children were arranged to take place at the daycare center, but when Bruce learned that Anderson was involved in the investigation, he refused to allow anyone to interview the children. Detective Steve Klingler, who investigated on behalf of the Kalispell Police Department, stated to Arnold that "if J.A. is being sexually abused, it is his belief that the perpetrator is someone other than Carol Allison." Arnold submitted the findings of the police department, as well as Detective Klingler's statement, to the District Court in a report dated July 9, 1992. Arnold wrote:

> Although I am sure BRUCE ALLISON feels he has acted in good faith on his children's behalf, I do not believe that BRUCE has acted in the best interests of [J.A.] and [C.A.]. I believe he has over-reacted, which has caused the children to be confused and scared. He has not followed the procedure suggested by Family Court Services or by the local Department of Family Services. BRUCE has made false accusations regarding my involvement in this matter. Although it may have been unintentional, I believe BRUCE's allegations against CAROL ALLISON to be false.

Hearing on all outstanding motions was held, but not concluded, on July 13, 1992. The District Court issued an order on

11

July 22, 1992, providing that the hearing be continued at a later date upon the motion of either party and that temporary residential custody continue with Bruce. The District Court further ordered that a social worker conduct an evaluation of the parties and their children and make recommendations to the court regarding the custody issues. On December 30, 1992, Carol requested that the court continue the hearing.

The hearing continued on March 30, 1993. Seven witnesses testified and a total of fourteen exhibits were admitted into evidence. The District Court took the matter under advisement and ordered that the hearing continue at a later date. The final hearing was held on July 29, 1993. During the July 29 hearing, five additional exhibits and three depositions were admitted into evidence. Carol, Bruce, and Rosemary McKinnon testified.

On December 9, 1993, the District Court issued findings, conclusions, and judgment returning residential custody of the parties' two children to Carol. Bruce appeals.

STANDARD OF REVIEW

This Court recently clarified the standard by which we review child custody modification cases:

> Motions or petitions to modify a sole custody provision or terminate a joint custody provision must satisfy the jurisdictional prerequisites set forth in § 40-4-219, MCA. Likewise, a motion or petition to modify child custody provisions in a dissolution decree which ha[s] the effect of substantially changing the primary residence of the parties' children, even though the formal designation of "joint custody" is retained, are to be construed as motions or petitions to terminate joint custody and must satisfy the jurisdictional requirements set forth in § 40-4-219, MCA. Any effort to

12

modify the physical custody, which does not seek a substantial change in the children's primary residence, may be considered by the district court according to the best interest standard set forth in § 40-4-212, MCA.

In re Marriage of Johnson (Mont. 1994), 879 P.2d 689, 694, 51 St. Rep. 703, 706.

In this case, the parties' were awarded joint custody of their children, J.A. and C.A., by decree of dissolution, and Carol was awarded primary residential custody. Bruce's July 29, 1991, motion sought to change the primary residence of the children to himself and to restrict Carol to visitation "on alternate weekends from Friday at 5:00 p.m. until Sunday at 7:00 p.m." We conclude that Bruce's motion sought a substantial change in the primary residence of the parties' children while retaining the formal designation of "joint custody." We, therefore, construe the motion as one to terminate joint custody and review the record to determine if the jurisdictional requirements set forth in § 40-4-219, MCA, are satisfied.

## ISSUE 1

Was there sufficient evidence to support the District Court's findings of fact and conclusions of law maintaining Carol as primary residential custodian of the parties' children?

"[T]he party requesting modification under § 40-4-219, MCA, bears a heavy burden because the statute's policy is to 'preserve stability and continuity of custody for the children.'" Johnson, (1994), 879 P.2d at 694 (citing In re Marriage of Stephenson (1988), 230 Mont. 439, 447, 750 P.2d 1073, 1075; In re Marriage of

13

Gahm (1986), 222 Mont. 300, 303, 722 P.2d 1138, 1140). In a child custody case, this Court will review the district court's findings to determine whether those findings are clearly erroneous. Johnson, 879 P.2d at 694; In re Marriage of Dreesbach (Mont. 1994), 875 P.2d 1018, 1021, 51 St. Rep. 374, 375. A finding is clearly erroneous only if: (1) the finding is not supported by substantial, credible evidence; (2) the district court misapprehended the effect of the evidence; or (3) after reviewing the record, this Court is left with a definite and firm conviction that a mistake has been committed. Johnson, 879 P.2d at 694 (citing In re Marriage of McClain (1993), 257 Mont. 371, 374, 849 P.2d 194, 196).

Section 40-4-212, MCA, requires the court to determine custody in accordance with the best interest of the child. To modify custody, § 40-4-219(1), MCA, requires the court to make each of the following determinations: (1) that a change has occurred in the circumstances of the child or custodian; (2) that modification is in the best interest of the child; and (3) that one of six enumerated circumstances exists. The best interest test of § 40-4-212, MCA, is, therefore, one of the three prongs under § 40-4-219(1), MCA.

After hearing all of the testimony in this case, the District Court made the following conclusions of law: that there had been "no significant change in circumstances of either child or of the residential custodial parent"; that under § 40-4-212, MCA, it was in the best interest of the children to return them to the physical

14

custody of their mother pursuant to the original decree of dissolution; and that none of the six factors under § 40-4-219(1), MCA, merited a permanent change in residential custody. Each of the three determinations required by § 40-4-219, MCA, were made by the District Court. Moreover, the District Court concluded that Bruce "has and likely would continue in the future to deny and frustrate contact between the children and [their mother]," and cited § 40-4-219(3), MCA, which provides that "[t]he court shall presume the custodian is not acting in the child's best interest if the custodian does any of the acts specified in subsection (1)(e) . . . ." Section 40-4-219(1)(e), MCA, provides for modification of custody if the court finds that the custodial parent willfully and consistently refuses to allow contact between the children and the noncustodial parent or attempts to frustrate or deny the noncustodial parent's visitation rights.

Bruce mischaracterizes the DFS reports when he asserts that "[o]n March 19, 1991, DFS confirmed that Carol had beaten R.E. on the face with a belt." (Emphasis added.) The DFS report merely states that DFS received a telephone call from a school counselor who stated that R.E. was in school with bruises on his face and that R.E. claimed that his mother had beat him with a belt. The DFS records show that a social worker went to the school and talked to both R.E. and T.E. The social worker discovered "some light redness" to the left side of R.E.'s face. R.E. told the social worker that his mother had slapped his face. According to R.E., he was slapped for fighting with T.E. Carol came to the DFS office

15

the following day to keep a previously scheduled appointment with the social worker, and she freely admitted that she slapped R.E.'s face. According to Carol's sworn testimony at trial, R.E. was cussing at her, "calling [her] every name in the book," and she slapped him across the face.

Similarly, Bruce mischaracterizes the DFS records by asserting that more than one incident of substantiated abuse occurred: "Carol <u>continued</u> to discipline R.E. by beating him and leaving bruises on his face . . . ." (Emphasis added.) A careful review of the DFS records and the testimony of the DFS social workers who thoroughly investigated Carol shows that only a single incident of substantiated abuse occurred: The slapping of R.E. on March 19, 1991. Bruce points to an entry in the DFS records dated April 23, 1991, to support his assertion of continuing abuse. The record clearly shows, however, that the social worker's entry referred to the March 19 slapping, and that on April 23 a discussion about that slapping took place between Carol and the social worker.

Bruce argues "that the record is overwhelming that it was in the best interests of the Allison children that Bruce continue as residential custodian." While there is some evidence in the record supporting Bruce's position, we conclude that the District Court's findings and conclusions are supported by substantial, credible evidence.

The record is filled with the testimony of the DFS investigators who were unable to confirm any physical or sexual abuse of J.A. and C.A., despite Bruce and his girlfriend's repeated

16

allegations. Arnold, who observed the children on a number of occasions after their visitation with Carol, testified that she never saw any evidence of abuse. Anderson, who investigated the allegations of sexual abuse, determined that abuse was not substantiated. Anderson also testified that "[i]t is uncommon for there to be that many unsubstantiated referrals coming from the same source."

Despite his recommendation that the children remain in the residential custody of Bruce, Wright conceded that no substantiation of abuse existed. Wright testified that his recommendation was not based on whether Bruce would make a better parent. Instead, his recommendation was

> based on the fact that the kids are in his custody now, and I believe it should be the Department's policy, and in fact it is our practice, to work with parents who have custody of the children and try to make sure they maintain that family relationship.

Custer, who investigated the slapping incident, testified that he "did not see reason to remove the children at that point in time" even though he had confirmed that Carol had slapped R.E. Custer testified that the emotional abuse of T.E., J.A., and C.A. was not substantiated. Custer testified that he investigated the allegation that Carol had pinched J.A.'s penis and concluded that such abuse was unsubstantiated. Custer also testified that he worked with Detective Brown of the Kalispell Police Department on the penis pinching allegations, and that Brown, likewise, concluded that the alleged abuse was unsubstantiated.

17

Burrington, who investigated the allegations of sexual abuse in conjunction with Custer, testified that DFS had no information which would have warranted the children's supervised visitations with Carol. She further testified that DFS had no evidence which substantiated the allegations of sexual abuse.

In addition to Wright, only three other non-party witnesses testified favorably on behalf of Bruce. Police Chief Dale Stone of the Columbia Falls Police Department testified that in February 1993 Bruce's mother called him and asked him to talk to J.A. According to Stone, Bruce's mother told him that J.A. had been acting out and inappropriately touching his sister. Bruce and his mother wanted Stone to tell J.A. that such behavior was inappropriate. Stone testified that J.A. told him that when Carol is mad at him, she would touch his private areas. Stone reported his findings to DFS, but did not conduct any investigation beyond the single interview with J.A.

Carol Lee testified that she interviewed J.A. in September 1992, and he spontaneously disclosed to her that his mother touched his private parts. She also interviewed Carol, Bruce, and the other children. Following her investigation, she recommended that Bruce continue as the residential custodian and that Carol have supervised visitations while she received counseling. She also testified that children may suffer stress and other difficulties following the divorce of their parents. In 1992, she determined that Bruce needed counseling for his need to be controlling. Lee further testified that, after her recommendation in the fall of

1992, she was no longer involved in the matter and had virtually no other contact with the parties. At trial, she refused to make any further recommendations due to her lack of current involvement.

McKinnon testified that her role in this matter was exclusively as J.A. and C.A.'s counselor. She began counseling the children in August 1991. She testified that, during one of their sessions, J.A. reported that his mother pinched his penis when she was mad at him. The disclosure came after Bruce contacted McKinnon and told her that J.A. had been caught touching other peoples' genitals. Bruce told McKinnon that he had asked J.A. where he learned to do that, and J.A. responded that his mother had done it to him. J.A. also reported to McKinnon that his aunt, his uncle, and a friend of his mother's also touched him in the same manner. However, in a letter dated May 12, 1992, following the disclosure, McKinnon stated that "[n]either of the children have given direct and unequivocal evidence of either physical or sexual abuse. This does not, of course, mean that it has not occurred. J.A. is . . . protective of his mother." Regarding J.A.'s disclosure, McKinnon also wrote: "He was able to tell me this same information [that Bruce had reported] but was clearly acutely uncomfortable and remained vague as to the nature of this touching and unable to give any further details." Based on her involvement, McKinnon recommended at trial that Bruce remain custodian, that C.A. be moved to unsupervised visitation with Carol, and that J.A. remain with supervised visitation. She testified that she was not an investigator, but strictly a counselor.

When Arnold spoke to J.A. about his statement that his mother pinches his penis when she is angry, all that J.A. would tell Arnold is "Daddy told me." Arnold reported her conversation with J.A. to the District Court in a written statement dated June 4, 1992. She also reported that she had concerns about the emotional trauma the children suffered from repeated questioning and examination by FCS, DFS, and a variety of law enforcement officials. She stated that Bruce's anger toward Carol was apparent and that he had talked negatively about Carol in the presence of the children.

Andrees also testified at trial. He stated that Carol's psychological tests "came out very well in all areas" and were not outside the normal psychological bounds. He determined that Carol was under a great deal of stress at the time of his initial examination of her. Carol began regular counseling with him in the fall of 1991. Andrees testified that he found it significant that the allegations of sexual abuse against Carol "began at the very time that DFS was preparing to close the case in the physical abuse charge and to leave residential care with the mother . . . ." In his experience, he had found that "[w]hen somebody wants to change a custodial situation, that's when they make new charges . . . . The outside parent frequently will look for other reasons to make charges to try to see if they can't reverse the way things are." Andrees testified that a pattern of complaints existed in this case and that the complaints emanated from Bruce, Bruce's girlfriend, and Bruce's mother. He stated that the repeated allegations did

20

not surprise him due to the established pattern. Because Carol's only contact with the children occurred during supervised visitation, he found the allegations of sexual abuse incredible.

Androes further testified that, based on his evaluation and ongoing counselling, he had no reason to deny Carol full custody of her children, or alternatively, to have normal visitation privileges.

Carol and Bruce also testified during the final hearing on July 29, 1993. Carol stated that her testimony that day was the first testimony or sworn statement that she had given during the entire matter. She confirmed that she had received no notice of Bruce's July 29, 1991, motion to modify custody and that she was not allowed to testify prior to the removal of her children from her home. She confirmed that she had been extensively investigated by DFS and the Kalispell Police Department and that she had submitted herself to two separate polygraph examinations. She stated that she had never been accused of abusing or neglecting her daughter T.E., who continued to reside with her during all of the instant proceedings.

Carol's attorney called Bruce to testify. The attorney asked Bruce if his testimony that day was the first sworn statement he had made in the custody proceedings. Bruce stated, "Yes, it is." He explained that his primary concern was for the well-being of his children. He testified that when Anderson concluded that the alleged abuse was unsubstantiated, he was dissatisfied and went over her head to Wright. He also complained about the local DFS

office to the Governor's office and to the Flathead County Attorney. Bruce conceded, however, that the claims that the County Attorney's office reviewed were rejected. Additionally, when Bruce was dissatisfied with Arnold's conclusion that there was no substantiated abuse, he went over her head to her boss at Family Court Services. Bruce acknowledged that Carol Lee had recommended that he needed counseling for his control and anger issues and that he needed to be evaluated for chemical dependency. He testified that he had attended some sexual addiction group meetings, had attended some Adult Children of Alcoholics meetings, and had seen Carol Lee twice for counseling, but that "affordability kind of comes into play" in his seeking any additional counseling.

Because its findings and conclusions are supported by substantial, credible evidence, we conclude that the District Court did not err in returning residential custody of the parties' children to Carol.

## ISSUE 2

Did the District Court err by issuing findings and conclusions substantially similar to Carol's proposed findings and conclusions?

The District Court issued over 21 pages of findings of fact and conclusions of law. Bruce argues that the District Court "abused its discretion by its abrupt, 'wholesale adoption' of" Carol's proposed findings and conclusions, which were submitted on computer disk as the court had requested both parties do. Bruce asserts:

A careful review of Findings of Fact, Conclusions of Law and Judgment entered by the Court reveals very little change from the proposed Findings of Fact, Conclusions of Law, and Judgment submitted by Carol's counsel, other than to change the names from Carol and Bruce to Respondent and Petitioner, and other minor changes of style in the text. There were no substantive changes by the District Court.

In support of his position, Bruce cites In re Marriage of Wolfe (1983), 202 Mont. 454, 457-58, 659 P.2d 259, 261, in which this Court stated:

[W]e [have] voiced our disapproval of trial courts relying "too heavily on the proposed findings and conclusions submitted by the winning party." A trial judge relies "too heavily" upon proposed findings when they are used "to the exclusion of a consideration of the facts and the exercise of his own judgment."

While we discourage the verbatim adoption of proposed findings and conclusions, "the practice does not constitute error per se." In re Marriage of Nikolaisen (1993), 257 Mont. 1, 5, 847 P.2d 287, 289. In Nikolaisen, we set forth the following test:

When reviewing the adequacy of the findings of fact and conclusions of law, we examine whether they are sufficiently comprehensive and pertinent to provide a basis for a decision, and whether they are supported by substantial evidence.

Nikolaisen, 847 P.2d at 289; Wolfe, 659 P.2d at 261. We conclude that the District Court's findings and conclusions meet the above test. Although the findings and conclusions are substantially similar to those proposed by Carol, they are comprehensive, pertinent, and are supported by substantial evidence contained in the record. The District Court, therefore, did not err by issuing findings and conclusions substantially similar to those proposed by Carol.

23

## ISSUE 3

Did the District Court properly conclude that the July 29, 1991, ex parte order changing residential custody was improperly issued, and therefore, should be vacated?

The District Court's finding of fact No. 8 states:

> No Affidavit was submitted or filed in support of Respondent's [July 29, 1991,] Motion [to Change Custodial Parent], contrary to the requirements of Section 40-4-220, Montana Code Annotated, which provides in relevant part:
>
> > "A. Party seeking a temporary custody order or modification of a custody decree shall submit, together with moving papers, an affidavit setting forth facts supporting the requested order or modification . . . ."

The District Court concluded as a matter of law that because the July 29, 1991, order was entered pursuant to a motion without a supporting affidavit, the order was issued contrary to §§ 40-4-220(1), -220(2)(a), and -213(1) and should be vacated.

Bruce argues that

> it was impossible for him to file an Affidavit in support of his Motion to Change Residential Custodian because DFS would not allow him to review its records regarding Carol, and therefore Bruce did not know the content of the DFS records regarding Carol and her children when he filed his Motion.

However, on July 1, 1991, pursuant to Bruce's motion, the District Court ordered DFS to produce its confidential files pertaining to Carol. The order, which was granted without a hearing and without notice to Carol, stated that

> [t]he information and materials in said files may only be disclosed as follows:
> a.   To the court;

24

> b. To counsel of record for the respective parties in this action . . . .

The record reveals that the District Court received the confidential information on July 9. Twenty days later, Bruce filed his ex parte motion to change custodial parent, stating:

> This Motion is made on the grounds and for the reasons that <u>the records of the Department of Family Services confirm</u> that the children have been abused and neglected by Carol J. Allison . . . and that therefore the best interests of the children necessitates modification of the residential custodian . . . .

(Emphasis added.) Bruce clearly knew the contents of the DFS records at the time he filed his motion for change of custodial parent on July 29. However, the record shows that Bruce did not file an affidavit in support of his motion.

The statutory mandate of § 40-4-220(2), MCA, is clear:

> (a) A party seeking a temporary custody order may request that the court grant a temporary assignment of custody ex parte. He shall so request in his moving papers and <u>shall submit an affidavit</u> showing that:
> . . . .
> (ii) although a previous determination of custody has been made, the child's present environment endangers his physical or emotional health and an immediate change of custody would serve to protect the child's physical or emotional health.
> (b) <u>If the court finds from the affidavits submitted by the moving party</u> that a temporary assignment of custody would be in the child's best interest under the standards of 40-4-212 or that the child's physical or emotional health is endangered and would be protected by a temporary assignment of custody, the court shall make an order placing temporary custody with the person designated by the moving party . . . and shall require all parties to appear and show cause within 20 days from the execution of the order why . . . in the case of a temporary order issued under subsection (2)(a)(ii), the court should not restore the child to the custodian from whom the child was removed by the temporary order.

25

(Emphasis added.)  The Code Commissioners' Note to § 40-4-220, MCA, further provides:

> This section establishes a procedure for seeking temporary custody or a modification of a custody decree by motion <u>supported with affidavits</u>.  The procedure is designed to result in denial of the motion without a hearing unless the court finds that <u>the affidavits</u> establish adequate cause for holding a hearing.  The procedure will thus tend to discourage contests over temporary custody and prevent repeated or insubstantial motions for modification.

(Emphasis added.)  The statute provides no exception to the affidavit requirement, and we refuse to create one.

We conclude that, because Bruce failed to file a supporting affidavit with his motion to change custodial parent, the District Court's order of July 29, 1991, improperly granted that motion. The District Court did not err by subsequently vacating that order.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

26

Justice Karla M. Gray, specially concurring.

I join in the Court's opinion on issues 1 and 3 and specially concur on issue 2, relating to whether the District Court erred in issuing findings and conclusions substantially similar to those proposed by Carol. As to that issue, I agree with the result reached by the Court, but not with all that is said therein. I write separately to clarify that, while I have serious concerns about the extent to which district courts are adopting verbatim, or nearly so, a party's proposed findings and conclusions, this case does not reflect such a wholesale adoption of findings.

Over the past decade, we have discouraged, and disapproved of, trial courts relying too heavily on the proposed findings submitted by a "winning party;" in that regard, we began with a principle that adopted findings must reflect the judge's own consideration of the facts and the exercise of the judge's own judgment. See, e.g., In re Marriage of Wolfe (1983), 202 Mont. 454, 659 P.2d 259. We continue to voice similar sentiments, while concurrently stating that "the practice does not constitute error per se." In re Marriage of Nikolaisen (1993), 257 Mont. 1, 5, 847 P.2d 287, 289. Indeed, our current approach seems to be that if the findings are comprehensive and are supported by substantial evidence, that is sufficient. Nikolaisen, 847 P.2d at 289. If we are no longer requiring that a judge's work reflect the judge's consideration of the record and exercise of his or her own conscientious judgment, the judicial system has been turned over to the lawyers to a degree I cannot support.

I understand better than most what trial judges are up against

27

with regard to juggling a back-breaking work load with inadequate time, staff and other resources. But we can go too far in permitting judges to rely on the advocates before them in trying to keep their dockets current. It is my view that we must require that a judge's findings and conclusions reflect independent judgment by the court (see In re Marriage of Kukes (1993), 258 Mont. 324, 328, 852 P.2d 655, 657) and that combing the record for substantial evidence to support those findings is not sufficient.

Here, the Court is correct that the District Court's findings and conclusions are comprehensive, pertinent and supported by the record. More importantly, they reflect the exercise of the court's independent judgment. They are not verbatim adoptions and, indeed, testimony of witnesses included at length in Carol's proposed findings was not included at all in the District Court's findings, presumably because the court did not give it the weight Carol thought was appropriate or any weight at all. Other findings were revised, added to, and deleted from in significant ways given the facts of the case.

Based on the record and the District Court's findings and conclusions before us, I join the Court in affirming.

_____
Justice

28