No. 04-050

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 14N

IN RE THE PARENTING OF
the child of D.D.,

K. K.,

Petitioner and Respondent,

v.

D. D. G.,

Respondent and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and for the County of Madison, Cause No. DF-29-1997-1,
The Honorable Wm. Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Karl Knuchel, Attorney at Law, Livingston, Montana

For Respondent:

J. Blaine Anderson, Jr., Attorney at Law, Dillon, Montana

Submitted on Briefs:  December 22, 2004

Decided:  January 31, 2005

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2    D.D.G. (Mother) appeals from an order of the District Court issued on December 30, 2002, holding her in contempt and granting K.K. (Father) temporary residential custody of their daughter, A.D.K (Daughter). Mother further appeals from a December 29, 2003, District Court order granting Father permanent residential custody of Daughter. We conclude the appeal of the temporary custody order ancillary to the contempt order is moot, we affirm the $750 contempt judgment entered December 30, 2002, and we the affirm the District Court's custody order of December 29, 2003.

¶3    We restate and address the issues as follows:

¶4    1. Does the District Court's final custody order require reversal because its temporary custody order was improperly entered?

¶5    2. Did the District Court err in imposing a $750 contempt judgment?

¶6    3. Did the District Court have jurisdiction to enter its final custody order of December 29, 2003?

¶7    4. Did the District Court abuse its discretion by changing residential custody from Mother to Father in its December 29, 2003, final custody order?

**FACTUAL AND PROCEDURAL BACKGROUND**

2

¶8 Daughter was born on August 20, 1997. Ten months later the District Court adjudged K.K. to be her father. At this time, Father lived in Elko, Nevada, and Mother and Daughter lived in Sheridan, Montana. Despite the substantial distance, the two parties managed to stipulate to a parenting plan in which Father would see Daughter at least four days per calendar month.

¶9 While the stipulated parenting agreement gave Father four full days per month with his daughter, he actually had her with him only part of the days allotted to him. Even if he stayed in Sheridan for consecutive days, Mother demanded that he pick up the child every morning and bring her back every evening, instead of allowing Daughter to spend the night with him. At this time, Father was driving back and forth between Elko and Sheridan to make his parenting appointments. When he found a new job in Colorado Springs, he began flying to make his appointments with his daughter.

¶10 After approximately two and one-half years under the stipulated parenting plan, the parties filed motions to hold each other in contempt. Mother alleged Father was not paying his child support. Father alleged parenting interference because Mother denied his parenting rights for various reasons–with or without notice–or delayed his visits by not having Daughter ready. The District Court denied both motions.

¶11 In February 2002 the parties agreed to a new parenting plan under which Father would have Daughter for extended periods of time. Problems quickly developed. When Father flew to Sheridan to pick up the child for her May 2002 visit, Mother told him Daughter was too sick to travel. Father later learned the doctor believed Daughter was well enough to travel. Father was forced to file a motion to enforce his June 2002 parenting

3

rights. Then, Mother attempted to change Father's August-September 2002 parenting time, which was planned well in advance and coincided with Father's wedding. The District Court held for Father in every instance.

¶12     In June 2002, the District Judge ordered that Mother change the child's surname to a hyphenated name reflecting both parents' surnames. Mother did not comply.

¶13     In July 2002, Father filed another motion for contempt alleging Mother's continued interference with his visitation. At the hearing on the motion, the District Court discovered Mother had not changed Daughter's name on her birth certificate. The District Court gave her thirty days during which to complete the birth certificate change. Mother continued to protest that order and failed to even make an attempt to comply until mid-December 2002.

¶14     In his motion dated July 18, 2002, Father prayed that the District Court hold Mother in contempt because she interfered in his parenting rights as outlined above, and suggested an appropriate sanction for such contempt would be to award him his attorney's fees and costs; Father did not pray for a change in residential custody. The hearing on this motion was held October 25, 2002. Father appeared with his attorney and Mother appeared *pro se*. Both parties called witnesses who were sworn and testified and both introduced documentary evidence.

¶15     At the conclusion of the hearing Father, through counsel, filed a written motion to change residential custody from Mother to himself. The motion contained a recitation of the stated reasons for the change, interference with his parental rights, and these reasons were substantially the same as the reasons he and his witnesses had just testified to at the contempt hearing. The motion did not pray for an emergency or temporary change in custody pending

4

a hearing. At the same time, Father orally moved the Court to amend the pleadings to conform to the evidence presented in the contempt hearing.

¶16 The District Court took the matter of the change in residential custody under advisement, told Mother that she had 30 days to respond to the motion, and set a hearing. Father then had an opportunity to reply to Mother's response. Daughter remained with Mother.

¶17 On November 22, 2002, within the time for a response set by the District Court's order, Mother retained counsel and responded to Father's motion to change the parenting plan by filing a brief in opposition to the motion, a motion to strike and an affidavit in opposition to the motion. Father replied. Father also, on December 12, 2002, supported his motion to change residential custody with affidavits.

¶18 The District Court entered its order on December 30, 2002, holding Mother in contempt for the interferences in parenting rights in May, June, and August-September. The District Court, in the contempt portion of such order, awarded Father $750 to reimburse him for the cost of plane tickets because Mother had denied his May 2002 parenting time when he traveled to Montana.

¶19 Also, in its Order of December 30, 2002, the District Court found that an emergency situation existed and transferred temporary residential custody from Mother to Father. At the time the order was entered, the child was visiting Father for Christmas, and the order provided that she would not return to Mother, but would remain with Father until Mother's next scheduled visitation.

¶20 Mother filed a direct appeal of that part of the Order of December 30, 2002, which

5

temporarily changed residential custody. However, the appeal was dismissed by order of this Court, holding that the contempt order was not reviewable on appeal as it was not attached to a final domestic relations order because the temporary custody order was not a final order. Order of April 8, 2003, Cause No. 03-070, In re the Parenting of the Child of D.D.

¶21 This litigation then proceeded on Father's motion to change residential custody. Discovery was conducted, motions were filed and ruled on, and preliminary hearings held. Over the course of the parties' parenting disputes, the District Court assigned two guardians ad litem, and the parents and child have visited with multiple psychologists.

¶22 The first guardian ad litem, Karen McMullin, commended Father for his "extreme, almost beyond human tolerance" efforts to maintain a bond with Daughter. Nevertheless, in 2000, she recommended Daughter remain in Mother's custody. Father, realizing he would need more evidence of parenting interference to prove the subtle ways Mother was manipulating Daughter, secured the court's permission, and began recording the conversations between himself, Mother and Daughter–with the Mother's knowledge.

¶23 Transcripts of these telephone conversations were introduced into evidence, as well as the tape recordings themselves. Some of these telephone conversations, admittedly small segments in hundreds of hours of conversations, clearly show Mother putting Daughter in a position where she was encouraged not to be with Father. For example, Mother would make sure that the five-year-old knew she would be missing a T-ball game if she visited with her father. When Daughter would become confused about who her father was, Mother reinforced her belief that Mother's husband was Daughter's father, by telling her "Daddy

6

here is daddy." Finally, Mother made Daughter feel guilty for visiting Father by repeatedly telling her how much her Sheridan family missed her.

¶24 After the District Court transferred temporary custody to Father in December of 2002, Mother and her family began abusing their telephone privileges. Mother's family made approximately 143 phone calls to Daughter during a period of six weeks. Mother and her family began calling every day, contrary to the court-ordered telephone schedule. Although some telephone calls came during the allotted times, Father and his family did not answer because the sheer volume and persistence of Mother's family's calls disrupted their peace. Beyond the simple schedule of times during which Mother and her family could call, the District Court also had to limit the lengths of the calls to redress this abuse.

¶25 The first guardian ad litem saw Daughter's home life and environment in Sheridan, but no witness other than Father had seen Daughter's home life and environment in Colorado Springs. Needing that information to determine the best interests of the child, the District Court appointed a second guardian ad litem, Colorado attorney Virginia Ethridge, to determine whether Father's home was a safe and healthful environment. Ms. Ethridge visited the home, talked with Daughter, her teacher, school principal, and vice-principal. She concluded Father's home was appropriate for Daughter.

¶26 To balance the perspectives, Mother hired her own expert, Rochelle Beley, M.S., LCPC, to determine what would be best for Daughter. Ms. Beley did not meet or talk with Father. In her custodial assessment, Ms. Beley found that Mother did deny Father's parenting time with Daughter and prevented him from spending quality time with his daughter. Nonetheless, she recommended returning Daughter to Mother because she feared

7

disrupting the bond between them. The District Court specifically considered Ms. Beley's report and testimony in its findings of fact transferring permanent residential custody to Father.

¶27 On August 15, 2003, the District Court held a hearing on Father's motion to change residential custody. Both parties appeared with counsel and the matter was tried. On December 29, 2003, the District Court entered its final order wherein it concluded both parents could provide stable care and meet Daughter's developmental needs, but determined Mother's abuse of phone privileges, willful and consistent attempts to frustrate and deny contact, and attempts to alienate Daughter from Father proved that Father was more likely to ensure Daughter has contact with Mother than vice versa. The District Court therefore changed residential custody of Daughter to Father and set a visitation schedule.

## STANDARD OF REVIEW

¶28 Our standard for review of contempt orders, pursuant to our granting a writ of certiorari, is first to determine whether the court which found contempt acted within its jurisdiction and, second, to determine whether there is substantial evidence to support the findings of the court. *Lee v. Lee*, 2000 MT 67, ¶ 19, 299 Mont. 78, ¶ 19, 996 P.2d 389, ¶ 19. In order for a court to act within its jurisdiction, it must have: (1) cognizance of the subject matter; (2) presence of the proper parties; and (3) the court's action must be invoked by proper pleadings and the judgment must be within the issues raised. *Lee,* ¶ 20. We review a district court's conclusions of law to determine whether they are correct. *In re Marriage of Czapranski*, 2003 MT 14, ¶ 19, 314 Mont. 55, ¶ 19, 63 P.3d 499, ¶ 19. When reviewing a district court's discretionary decisions, we review its findings of fact to determine whether

8

they are clearly erroneous. *Czapranski*, ¶ 10. Because the district court is in a superior position to weigh the evidence, we will not overturn the court in child custody matters unless we determine that there has been a clear abuse of discretion. *Czapranski*, ¶ 10.

**DISCUSSION**

**ISSUE 1**

**¶29 Does the District Court's final custody order require reversal because its temporary custody order was improperly entered?**

¶30 Rather than follow the statutory procedure and file a motion for a change in the parenting plan supported by affidavits, counsel for Father filed the motion without an affidavit. Then, counsel moved to conform the evidence on a different motion, the motion for contempt that had just been heard, to the new motion to amend the parenting plan. While we may now, belatedly, suspect that counsel was attempting to bypass the affidavit practice called for in § 40-4-220, MCA, by use of Rule 15(a), M.R.Civ.P., this is a procedure not specifically provided for by the statutes or the Rules of Civil Procedure.

¶31 Mother would have us reverse the District Court's final custody order of December 29, 2003, because, she argues, the temporary change of custody ordered on December 30, 2002, was without legal authority and in violation of her right to procedural due process. She claims that there was no affidavit filed as required for a temporary custody order, that the temporary change in custody was at no time requested by Father in his pleadings and that she had no notice or opportunity to defend herself from such action.

¶32 Father responds that he made a motion in open Court to amend his motion for contempt to include the sworn testimony at the hearing of October 25, 2002, and such sworn

9

testimony satisfies the affidavit requirement of § 40-4-220, MCA. He points out that the District Court did not immediately grant the requested change in custody, and delayed making the temporary change until after Mother took full advantage of her opportunity to obtain counsel, to file a response, and to file counter affidavits. Thus, he argues, Mother was not denied procedural due process.

¶33 Father also argues that as the best interests of the child are paramount, the District Court acted within its authority to enter a temporary custody order changing residential custody *sua sponte* when, after an examination of the full record, it found that the change was required to protect the mental and emotional health of Daughter.

¶34 Section 40-4-220, MCA, requires that a party moving for a custody order, either temporary or final, must submit with his moving papers an affidavit setting forth facts supporting the suggested plan. This Court has held that § 40-4-220, MCA, provides no exception to the affidavit requirement and has declined to create one. *In re Marriage of Allison* (1994), 269 Mont. 250, 267, 887 P.2d 1217, 1227. However, this Court has also held that the requirement is substantial compliance with affidavit practice to ensure that all parties have notice and an opportunity to respond. *In re Marriage of Anderson* (1989), 240 Mont. 316, 321, 783 P.2d 1372, 1375; *In re Marriage of Stout* (1985), 216 Mont. 342, 347, 701 P.2d 729, 732.

¶35 In this instance, the required affidavit was not filed with the motion to change custody. However, Mother was fully aware of the reasons for the motion by its terms, as well as the testimony of Father and his witnesses given under oath and on the record at the October 25, 2002, hearing. Further, she was given time within which to respond, and she

did so with the assistance of counsel. Thus, she was not unfairly surprised by the motion or the reasons offered for the change in custody.

¶36 We have approved of a District Court's *sua sponte* visitation order to advance the paramount best interests of a child. *See Groves v. Clark*, 1999 MT 117, ¶¶ 27-28, 294 Mont. 417, ¶¶ 27-28, 982 P.2d 446, ¶¶ 27-28. However, there appears to be no precedent where we have held that a District Court may act as it did here; that is, make a finding that the mental and emotional health of a child requires an immediate change in residential custody when neither party has prayed for such an order.

¶37 The December 30, 2002, order of the District Court temporarily changing Daughter's residential custody on an emergency basis, without a demand for such immediate change, and without the proper motion and affidavit having been filed, was error. However, the issues surrounding custody of the Daughter have now been fully presented to the District Court and determined. Based on the record before us, we do not conclude that the final custody order, entered a year later, after the issues were fully and fairly litigated, must be set aside because proper procedure was not followed in the entry of the temporary order.

¶38 A moot question is one which existed once but no longer presents an actual controversy. *E.g., Jim & Tracy's Alignment, Inc. v. Smith,* 1998 MT 203, ¶ 8, 290 Mont. 368, ¶ 8, 966 P.2d 731, ¶ 8. "[A]n issue is moot when it no longer presents a justiciable controversy, due to the occurrence of a given event or the passage of time." *Heisler v. Hines Motor Co.* (1997), 282 Mont. 270, 275, 937 P.2d 45, 48. When the final custody order of December 29, 2003, was entered the issue of whether the temporary custody order was properly entered became moot.

11

¶39 A parent aggrieved by an improper temporary custody order is not without any remedy. When a parent can establish that the entry of a temporary order constitutes a mistake of law, causing a gross injustice, for which an appeal is not an adequate remedy, the extraordinary writ of supervisory control might issue. Rule 17(a), M.R.App.P.; *In re Matter of D.A.*, 2003 MT 109, ¶ 18, 315 Mont. 340, ¶ 18, 68 P.3d 735, ¶ 18.

¶40 We decline to reverse the District Court's final custody order because of the now moot procedural deficiencies leading up to the temporary order of December 8, 2002.

## ISSUE 2

¶41 **Did the District Court err in imposing a $750 contempt judgment?**

¶42 Immediately after the District Court entered its December 30, 2002, order, Mother filed a direct appeal of the temporary custody portion of the order. She argued that such temporary custody order was ancillary to a judgment that she was in contempt of Court, and thus it was appealable pursuant to § 3-1-523(2), MCA.

¶43 Unlike most contempt orders, reviewable only pursuant to a writ of certiorari, Montana has carved out an exception for contempt orders in family law proceedings. *Lee v. Lee*, 2000 MT 67, ¶ 24, 299 Mont. 78, ¶ 24, 996 P.2d 389, ¶ 24. Section 3-1-523, MCA, provides as follows:

> Judgment and orders in contempt cases final–family law exception.
> (1) The judgment and orders of the court or judge made in cases of contempt are final and conclusive. Except as provided in subsection (2), there is no appeal, but the action of a district court or judge can be reviewed on a writ of certiorari by the supreme court or a justice of the supreme court . . . .
> (2) A party may appeal a contempt judgment or order in a family law proceeding only when the judgment or order appealed from includes an ancillary order that affects the substantial rights of the parties involved.

12

¶44    Rule 1, M.R.App.P., provides for an appeal only from final orders.  Thus, for a family law contempt judgment to be directly appealed, it must include a final, ancillary order that affects the substantial rights of the parties involved.  Section 3-1-523, MCA; *see In re Matter of D.A.*, 2003 MT 109, ¶ 19, 315 Mont. 340, ¶ 19, 68 P.3d 735, ¶ 19 (holding "orders of temporary custody are not 'final judgments,' subject to direct appeal, but instead are interlocutory orders from which this Court will grant relief in extraordinary circumstances"); *Lee,* ¶ 37.

¶45    The December 30, 2002, Order clearly constitutes a contempt judgment in a family law proceeding, and it included a temporary residential custody order, which is an ancillary order that affected the substantial rights of Mother.  Nevertheless, a *temporary* custody order is not a *final* ancillary order, but is rather an interlocutory order.  Thus, § 3-1-523(2), MCA, does not apply.  *See Matter of D.A.*, ¶ 19.  As such, the contempt order does not fall within the statute and is not appealable.

¶46    We dismissed Mother's first appeal on April 8, 2003, in Cause No. 03-070, for failing to fit within the family law exception of § 3-1-523, MCA.  While the result of our order was correct, dismissal of the appeal, we incorrectly told Mother she could file a direct appeal of the contempt citation when a final custody order was entered.  Contrary to our order, a writ of certiorari is the only proper way to review the contempt portion of the December 30, 2002, order.

¶47    Mother has in this appeal, at least by implication, asked us to review and reverse the judgment of December 30, 2002, that she was in contempt.  In view of the statement in our order of April 8, 2003, No. 03-070, that we would review the contempt judgment if it was

13

later appealed, we have deemed the notice of appeal and briefs herein to include a petition for a writ of certiorari for review of the contempt judgment, and thus we have examined its propriety.

¶48    In this instance, the District Court sanctioned Mother $750, to reimburse Father for airplane tickets he secured for the May visitation that was denied him.  This is the only sanction imposed for contempt.  The money judgment is not ancillary to the contempt, but integral to the contempt order. *Cf. Grounds v. Coward*, 2000 MT 128, ¶¶ 5-6, 300 Mont. 1, ¶¶ 5-6, 2 P.3d 822, ¶¶ 5-6, discussing *Lee v. Lee,* 2000 MT 67, 299 Mont. 78, 996 P.2d 389 (In *Lee* the family law exception applied because the contempt judgment was accompanied by a money judgment due under a dissolution decree).

¶49    We conclude that the $750 judgment was within the District Court's contempt jurisdiction pursuant to the motion for contempt, and that there was no abuse of discretion in imposing this sanction.  Father testified that he had secured three round-trip airfares at an average cost of $250 to $350 to exercise his visitation, and was denied the ability to have the child with him.  While somewhat imprecise, the testimony was sufficient to show the tickets were essentially wasted, and Mother offered no rebuttal evidence.  The District Court was entitled to believe this amount of loss was directly caused by Mother's contempt of the visitation orders, and we will not disturb such on appeal.

## ISSUE 3

¶50    **Did the District Court have jurisdiction to enter its final custody order of December 29, 2003?**

¶51    Mother argues that because Father's motion to change the residential parenting plan,

filed immediately after the hearing of October 25, 2002, was not supported by affidavit, the District Court was without jurisdiction to hear it. However, it is clear that an affidavit supporting this motion was filed on December 12, 2002, some eight months before the hearing on the motion. The affidavit supporting the motion was filed within ample time for Mother to meet the allegations therein. Both parties conducted discovery, retained experts, and were prepared for the hearing on the motion. The District Court had obtained jurisdiction through the proper pleadings and had before it all that was necessary to fairly try the matter on its merits. Sections 40-4-219, 220, MCA.

**ISSUE 4**

¶52 **Did the District Court abuse its discretion by changing residential custody from Mother to Father in its December 29, 2003, final custody order?**

¶53 Mother argues that the District Court abused its discretion by failing to adopt the recommendations of Ms. Beley, who she argues is the only expert that was qualified to give an opinion about custodial placement. She relies on *In re Marriage of McKenna*, 2000 MT 58, 299 Mont. 13, 996 P.2d 386, for the proposition that a district court must adopt the recommendations of a particular expert if she were the only expert to testify at the hearing. Mother mischaracterizes *Marriage of McKenna*. There, the district court heard from four experts at the hearing, considered them all in its factual findings, and adopted the recommendations of two of the experts.

¶54 District courts must determine child custody matters in accordance with the best interests of the child after considering a "variety of statutory factors including, but not limited to, the parents' wishes, the interaction and interrelationship of the child with the child's parents, continuity and stability of care, and whether the child has frequent and continuing contact with both parents." *Czapranski*, ¶ 11. "While a district court must consider the best interest factors enumerated in § 40-4-212(1), MCA, it need not make specific findings relating to each." *Czapranski*, ¶ 48.

¶55 As we said in *Marriage of McKenna,* while the record reflects that both parents are good parents,

> [I]t is not this Court's role to second-guess the fact-finding function of the District Court. Where there are conflicts in the testimony, it is the function of the trier of fact to resolve those conflicts. We will not substitute our judgment

16

for that of the trier of fact as the trial court is in a better position than this Court to resolve child custody issues. [Internal citations omitted].

*Marriage of McKenna*, ¶ 17.

¶56 The District Court found that both households are stable and can meet Daughter's developmental needs. Its findings specifically considered Ms. Beley's report but concluded that it conflicted with other competent evidence. The District Court's decision need not conform to a particular piece of evidence or a particular expert's report or testimony as long as the court had substantial credible evidence supporting its decision. *See Marriage of McKenna*, ¶ 18.

¶57 The District Court had before it substantial credible evidence supporting its determination that it is in Daughter's best interest that Father be designated as residential custodian. Specifically, an abundance of evidence shows that Mother willfully and consistently attempted to frustrate or deny contact between Daughter and her Father. Mother's own expert admitted that Father will better ensure Mother has contact with Daughter than vice versa. The record shows that Mother has attempted to openly alienate Daughter from Father and his wife, and, instead of alleviating the stress and disruption for Daughter, has added to it.

¶58 Where, as here, "the trial court has properly considered the factors set forth in § 40-4-212, MCA, has relied on professional assessments of the child's best interest, and has made an 'independent analysis of the facts of the case to make its custody decision,' there is no clear abuse of discretion." *Marriage of McKenna*, ¶ 19.

## CONCLUSION

¶59     The judgment of the District Court is affirmed.


/S/ JOHN WARNER


We Concur:


/S/ JIM RICE
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART

Justice James C. Nelson concurs.

¶60 I concur in our discussion and resolution of Issues 3 and 4. I concur in the result of Issue 1, primarily because the best interests of the child demand that result. I write separately, however, to express my dismay with the procedural background of this case as set out in our discussion of Issue 1. I concur in the result of Issue 2, but for different reasons than the Court.

¶61 Section 40-4-220(1), MCA, states:

[T]he moving party seeking an interim parenting plan or amendment of a final parenting plan shall submit, together with the moving papers, an affidavit setting forth facts supporting the requested plan or amendment and shall give notice, together with a copy of the affidavit, to other parties to the proceeding, who may file opposing affidavits. The court shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, based on the best interests of the child, in which case it shall set a date for hearing on an order to show cause why the requested plan or amendment should not be granted.

¶62 The Commissioners' Note to § 40-4-220, MCA, also states:

This section establishes a procedure for seeking temporary custody or a modification of a custody decree by motion supported with affidavits. The procedure is designed to result in denial of the motion without a hearing unless the court finds that the affidavits establish adequate cause for holding a hearing. The procedure will thus tend to discourage contests over temporary custody and prevent repeated or insubstantial motions for modification.

¶63 As our Opinion points out, in *In re Marriage of Allison* (1994), 269 Mont. 250, 267, 887 P.2d 1217, 1227-28, we held that the district court erred in granting the father's motion to change the custodial parent designation at issue in that case because the father failed to file a supporting affidavit with his motion. In so holding, we noted--quite simply--that § 40-

19

4-220, MCA, provided no exception to the affidavit requirement, and we "refuse[d]" to create one.

¶64 Notwithstanding the result we have reached in Issue 1, the rule which we established in *Allison* remains clear. Section 40-4-220(1), MCA, requires a supporting affidavit where there is a motion for an interim parenting plan or amended final parenting plan. This Opinion should not be read, in my view, as eroding that requirement in any way whatsoever.

¶65 As for Issue 2, I would not deem Mother's appeal to be a writ of certiorari. Rather I would review the contempt issue under the doctrine of law of the case. As we point out in ¶ 46, we told Mother she could file a direct appeal of the contempt order in our April 8, 2003 Order. While we were incorrect in doing so, that necessarily became the law of this case, and we are bound by that. *Scott v. Scott* (1997), 283 Mont. 169, 175-76, 939 P.2d 998, 1001-02.

¶66 With those caveats, I concur.


/S/ JAMES C. NELSON


Chief Justice Karla M. Gray joins in the concurrence of Justice James C. Nelson.


/S/ KARLA M. GRAY