In re Clarence Ernest BEARDSLEE,
Debtor.

Clarence Ernest BEARDSLEE, Plaintiff,

v.

Margery A. BEARDSLEE, Defendant.

Bankruptcy No. 94–21490.
Adversary No. 95–6089.

United States Bankruptcy Court,
D. Kansas.

June 19, 1997.

Roger L. Sherman, Overland Park, KS, for Plaintiff.

Richard C. Wallace, Evans and Mullinix, P.A., Lenexa, KS, for Defendant.

## MEMORANDUM OPINION [1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

When Clarence and Margery Beardslee divorced in 1993, the court awarded Clarence the marital residence and assigned him joint unsecured debts for payment. After Clarence filed Chapter 7 bankruptcy, exempted the residence, and received a discharge, Margery obtained a state court ruling ordering Clarence to sell the residence and pay the unsecured debts from the sale proceeds. Clarence appealed, claiming the ruling was tantamount to collecting a discharged debt as a personal liability. Having lost the appeal, Clarence now mounts a collateral attack on the ruling, but under the Rooker–Feldman doctrine, this Court lacks subject matter jurisdiction.

The adversary issues are addressed in the Final Pretrial Order, and cross motions for summary judgment have been filed on undisputed facts.[2]

### Findings of Fact

The Hon. James W. Bouska of the District Court of Johnson County, Kansas, granted the parties a divorce on July 1, 1993, and a Decree of Divorce was filed on August 16, 1993. Judge Bouska divided property and assigned debt in the decree by referring to a proposed Division of Assets and Liabilities suggested by Clarence, the respondent in the divorce case:

> 5. That the parties' property and debts are divided and assigned as reflected in the respondent's proposed Division of Assets and Liabilities (attached hereto as Exhibit "A"), at the values and sums there shown.... All debts shown as "joint liabilities" on page 2 of said proposal are assigned to the respondent.[3]

The proposal, consisting of two pages, is attached to this opinion as Appendix A.

Page 1 of the proposal lists the residence among those assets awarded to Clarence. Capitol Federal Savings Association held the first mortgage on the residence securing $62,200. Household Finance Corporation held the second mortgage securing $22,279. These joint mortgage liabilities were assigned to Clarence by the language of the Decree of Divorce. Although neither the proposal nor the decree place a value on the residence, Clarence's later filed bankruptcy schedules list its worth as $105,000, indicat-

1. Plaintiff-debtor Clarence Ernest Beardslee appears by his attorney, Roger I. Sherman, Overland Park, Kansas. Defendant Margery A. Beardslee appears by her attorney, Richard C. Wallace of Evans and Mullinix, P.A., Lenexa, Kansas.

2. On January 8, 1996, Clarence filed his Motion for Summary Judgment and supporting brief, which he amended on July 8, 1996. On July 10, 1996, Margery filed a Motion for Summary Judgment with a supporting brief. Both parties filed supplemental briefs thereafter.

The parties appeared for a status conference on December 4, 1996, at which time they presented a Final Pretrial Order. The Court asked counsel to file an amended pretrial order reflecting the proceedings in the Kansas Supreme Court. Accordingly, they filed a Supplemental Pretrial Statement on December 11, 1996.

3. Decree of Divorce dated July 1, 1993, filed August 16, 1993, *In the Matter of the Marriage of Beardslee,* at 2 (attached as Exhibit B to Memorandum in Support of Defendant's Motion for Summary Judgment filed July 10, 1996).

ing that Clarence's equity in the property was approximately $21,000.

Page 2 of the proposal itemizes the unsecured joint liabilities the divorce court assigned to Clarence. These unsecured debts total $22,385.51 or $25,051.56, depending on which number is used for Household Finance's claim:

| | |
|---|---|
| IRS | $ 688.00 |
| Household Finance Corporation | $ 3,726.95 |
| | (now 6,393.00) |
| CNB Mastercard | $ 2,794.63 |
| CNB Visa | $ 3,372.91 |
| MBNA | $11,803.02 |
| | $22,385.51 |

A footnote on page 2 of the proposal indicates Clarence had offered to assume all joint debts if he were awarded the marital residence:

> *Husband's proposal to assume all joint debts is contingent upon being awarded the marital residence. If the real estate is set aside to Wife, Husband proposes to equally divide the joint liability.[4]

Shortly after the divorce, Margery filed a Motion to Reconsider the decree and Clarence filed a Motion to Restore Possession. In response to these motions, Judge Bouska modified the Decree of Divorce on September 23, 1993. Under this modification, Margery would remain in the residence until October 31, 1993, when she would relinquish possession to Clarence. Clarence would begin making monthly payments toward the first and second mortgages on November 1, 1993, and he would pay Margery an additional $4,500. Clarence would also be required "to refinance the subject real estate on or before January 1, 1994, or in the alternative, to arrange for the release of all obligations of the petitioner on said first and second mortgages on or before said date."[5]

On August 15, 1994, one day short of a year after entry of the decree, Clarence petitioned for relief under Chapter 7 of the Bankruptcy Code. In his bankruptcy schedules, Clarence listed the assigned debts to the IRS, Household Finance Corporation, CNB Mastercard, CNB Visa, and MBNA. He also listed Margery as a creditor with the notation: "Divorce Marital Joint Debts $23,-337.50." [6]

Upon receiving the Chapter 7 petition, the Clerk of the Bankruptcy Court mailed to creditors and the debtor the customary *Notice of Commencement of Case Under Chapter 7 of Bankruptcy Code, Meeting of Creditors, and Fixing of Dates*. This notice set the date for the First Meeting of Creditors for September 14, 1994, at 9:30 a.m. and set the date for the Discharge Hearing for December 19, 1994, at 10:30 a.m.

On September 22, 1994, Margery filed a Motion for Relief from Automatic Stay and gave notice using the bankruptcy procedure of "notice with opportunity to object." [7] In her motion, Margery asked for permission to apply to the divorce court for "reconsideration" of the terms of the decree in regard to the exempt homestead. Having no basis for objection, Clarence did not oppose the motion, and Margery's counsel submitted a pro-

---

4. Respondent's Proposed Division of Assets and Liabilities at 2, Exhibit A to Decree of Divorce dated July 1, 1993, filed August 16, 1993, *In the Matter of the Marriage of Beardslee* (attached as Exhibit B to Memorandum in Support of Defendant's Motion for Summary Judgment filed July 10, 1996).

5. Journal Entry dated August 27, 1993, filed September 23, 1993, *In the Matter of the Marriage of Beardslee*, at 2 (attached as Exhibit D to Memorandum in Support of Defendant's Motion for Summary Judgment filed July 10, 1996).

6. Debtor's Schedule F—Creditors Holding Unsecured Nonpriority Claims—filed August 15, 1994.

7. "Notice with opportunity to object" is a procedure peculiar to bankruptcy practice. Many provisions of the Code permit the court to act "after notice and a hearing." The meaning of this phrase is not quite as it seems, however. Section 102(1) of Title 11, United States Code, explains the phrase. It "(A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but (B) authorizes an act without an actual hearing if such notice is given properly and if—(i) such a hearing is not requested timely by a party in interest...." Using this procedure, a party filing for stay relief can give notice stating that the court will enter an order sustaining the motion if no interested party files an objection by a date certain stated in the notice. If no one files an objection by that date, the movant is entitled to an order sustaining the motion because the requirement of "after notice and a hearing" has been satisfied. Under this procedure, designed to handle the large number of orders processed in bankruptcy cases, bankruptcy judges sometimes sign orders that later prove to have been ill-advisedly entered.

posed order, which the Court entered on October 18, 1994:

> IT IS HEREBY ORDERED that Margery A. Beardslee is relieved from the automatic stay and that the same is hereby lifted so that Margery A. Beardslee may take such legally cognizable acts as are necessary to apply to the District Court of Johnson County, Kansas for reconsideration of the terms of the above referenced Divorce Decree in regards to the homestead, on [sic] exempt assets of the debtor, and not property of this estate.[8]

With the stay relief order in hand, Margery returned to state court where she filed a Motion to Reform the Decree of Divorce under KAN.STAT.ANN. § 60–260(b) on December 15, 1994.[9] On December 19, 1994, at 10:30 a.m., as previously scheduled in the bankruptcy Notice of Commencement, a discharge hearing was held. At that time, there having been no objections, this Court granted Clarence his discharge. On February 27, 1995, the Clerk of the Bankruptcy Court filed the Order of Discharge in Clarence's Chapter 7 case.

Judge Bouska ultimately heard Margery's Motion to Reform Decree of Divorce on April 19, 1995, by which time Clarence had been discharged from his prepetition debts for more that one and a half months.[10] Nevertheless, on that date Judge Bouska ordered Clarence to sell his homestead, to pay the mortgages against it from the sale proceeds, and to pay the joint unsecured debts out of the sale proceeds. The formal Journal Entry memorializing the judge's ruling was filed on May 23, 1995.

Clarence appealed the decision to the Court of Appeals of the State of Kansas on May 31, 1995. In his appeal, he claimed that the bankruptcy discharge extinguished any legal obligation he owed to Margery under the decree of divorce. He argued that Judge Bouska's decision requiring him to sell the residence and pay the $22,385.51 joint unsecured debt out of his unencumbered equity was contrary to the bankruptcy discharge

injunction and tantamount to collection of a discharged debt as a personal liability.

While pursuing his state court appeal, Clarence also proceeded in bankruptcy court. He filed this adversary proceeding on June 5, 1995, calling it a Motion for Contempt and to Enjoin Defendant. The pleading, captioned in *Clarence Ernest Beardslee vs. Margery A. Beardslee*, Adv.Proc. No. 95–6089, has been treated as an adversary complaint, although it was designated a motion. It asks that Margery be enjoined from collecting debts discharged in bankruptcy, Judge Bouska's judgment notwithstanding, and that she be found in contempt for having proceeded before Judge Bouska after Clarence's discharge. Margery answered Clarence's action on August 2, 1995.

At a pretrial conference on October 4, 1995, Clarence advised this Court, through his counsel, that he had appealed Judge Bouska's ruling to the Kansas Court of Appeals. He also announced that he intended to pursue that appeal while the adversary proceeding moved toward a motion for summary judgment. At a subsequent pretrial conference on September 10, 1996, Clarence advised the Court that on August 16, 1996, the Court of Appeals had issued an opinion affirming Judge Bouska's decision and that he (Clarence) had filed a Petition for Review in the Kansas Supreme Court. The result of that petition was communicated to this Court at a pretrial conference on December 4, 1996, when Clarence reported that the Kansas Supreme Court had denied review on September 26, 1996.

As of April 1, 1997, the state court order remained unexecuted. To maintain the status quo, this Court stayed Margery from taking any action to sell the residence pending this decision.

### Discussion

Although often used interchangeably, the terms *discharge* and *dischargeability* have different meanings. The term *discharge* re-

---

8. Order for Relief from Automatic Stay filed October 18, 1994, at 1.

9. This Kansas statute is the counterpart of Fed. R.Civ.P. 60.

10. Transcript of hearing held April 19, 1995, before the Honorable James W. Bouska. *In the Matter of the Marriage of Beardslee,* Case No. 93C594 in the District Court of Johnson County, Kansas.

fers to the operation of the Bankruptcy Code provision (§ 727 in a Chapter 7 case) that effects a general discharge of the debtor's prepetition debts. The term *dischargeability* refers to the operation of the Code provision, § 523, that excepts particular debts from the general discharge provision of the Code. Under § 523, certain kinds of debts are delineated as being nondischargeable, meaning that those debts are not operated on by the general discharge and therefore remain collectable outside of bankruptcy. This case involves questions about the general discharge and whether it has operated to extinguish a particular debt that does not fall within any of the categories of debt commonly called nondischargeable under § 523.[11]

The Code defines debts broadly—a "debt" is a "liability on a claim" and "claim" means:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.... [12]

The general discharge of § 727(b) "discharges the debtor from all debts that arose before the date of the order for relief under this chapter...."

■■■ This dispute involves three kinds of prepetition debts. Two of these kinds of debts are obvious: the joint mortgage debts and the joint unsecured debts. There is no question that the bankruptcy discharge operated to extinguish Clarence's legal obligation to pay the joint mortgage debts and the joint unsecured debts as personal liabilities. These debts are Clarence's prepetition, liquidated, noncontingent, undisputed debts that clearly fall within the Chapter 7 discharge.

The mortgage liens, however, survive discharge and are enforceable *in rem* against the residence they encumber.[13] Since the residence was exempted from the bankruptcy estate and stay relief regarding it was granted, there is no question that the bankruptcy discharge did not impede the divorce court from ordering Clarence to sell his residence to satisfy the mortgage liens. However, the mortgage liens did not extend to the approximately $21,000 of equity Clarence owned in the residence.

■■ The third kind of debt is the less obvious; it is the hold-harmless debt that the decree may have created. In his bankruptcy schedules, Clarence listed Margery as a creditor with the notation: "Divorce Marital Joint Debts $23,337.50." Apparently Clarence thought he owed Margery a hold-harmless obligation under the decree. If he did owe such a debt, it came within the broad definition of a prepetition "claim" and would have been discharged along with Clarence's other personal debts on February 27, 1995, well before Margery obtained an order modifying the decree on April 19, 1995.

If the hold-harmless debt was discharged, the discharge injunction was violated. The automatic stay of § 362(a), the discharge of § 727(a) and (b), and the discharge injunction of § 524(a) work together. From the filing of the case to the entry of an order of discharge, the automatic stay prevents collection of claims against the debtor. When the order of discharge is entered, the debtor's liability on claims is extinguished. The discharge injunction of § 524(a) then prohibits the collection of a discharged debt as a *personal liability* of the debtor:

A discharge in a case under this title—...
(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a *personal liability* of the debtor,

---

**11.** Before Judge Bouska, Margery conceded that the bankruptcy discharge had occurred. She made no claim then, and she makes no claim now, that any claim against Clarence she might possess under the decree came within any exception to discharge under § 523(a). Transcript of hearing held April 19, 1995, before the Honorable James W. Bouska, *In the Matter of the Mar-*

*riage of Beardslee,* Case No. 93C594 in the District Court of Johnson County, Kansas.

**12.** 11 U.S.C. § 101(5).

**13.** *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

whether or not discharge of such debt is waived.... (Emphasis added.)

If Clarence owed a debt to Margery to hold her harmless on the assigned debts, and if that debt was discharged prior to Judge Bouska's order modifying the decree, the bankruptcy discharge injunction of § 524(a) operated to enjoin collection of that debt as a personal liability of Clarence's. Requiring Clarence to pay the joint unsecured debts from his equity in the residence, where Margery holds no lien on that equity, arguably constitutes the enforcement of a *personal liability* on a debt discharged in bankruptcy.

All of this assumes, of course, that Judge Bouska had jurisdiction to decide the federal discharge question. Addressing this jurisdiction question in its opinion, the Kansas Court of Appeals cited *In re Marriage of Ray*, 21 Kan.App.2d 615, 617, 905 P.2d 692, 695 (1995), for the proposition that dischargeability of a debt is exclusively the province of the bankruptcy court:

> A decision by a federal bankruptcy court as to whether a debt was discharged takes precedence over a decision of a state trial court on that issue. *In re Marriage of Ray*, 21 Kan.App.2d 615, 617, 905 P.2d 692 (1995). The *Ray* court noted: "In general bankruptcy courts have exclusive jurisdiction in determining the dischargeability of debt. Dischargeability of a debt is controlled by the bankruptcy code."[14]

■ In the context of the *Ray* case, the first sentence of this quotation is correct. When deciding between a state court determination and a bankruptcy court determination of whether a debt is discharged, as the court did in *Ray*, deference should be given to the bankruptcy court's ruling if it was made prior to the state court ruling. However, if the state court had jurisdiction and ruled first, it does not follow that the bankruptcy court can later determine that same question.

■ The second sentence of the quotation is not entirely correct. Bankruptcy courts do have exclusive jurisdiction to determine dischargeability of claims under § 523(a)(2), (4), and (6). These subsections of § 523(a) refer to claims generated by fraud, defalcation of a fiduciary, and willful and malicious conduct, respectively. But state courts have concurrent jurisdiction to determine all other types of nondischargeability matters under § 523.[15] And state courts have concurrent jurisdiction to determine whether the general discharge of the Code applies to a particular debt, as in this case. *In re Marriage of Sailsbury*, 13 Kan. App.2d 740, 779 P.2d 878 (1989). Consequently, Judge Bouska had subject matter jurisdiction to determine the legal effect of Clarence's federal claim of discharge. As Clarence's attorney argued on appeal, given this jurisdiction, Judge Bouska was bound to enforce the Laws of the United States under the Supremacy Clause, U.S. CONST. art. VI, cl. 2.

The Court of Appeals noted that Clarence was discharged before Judge Bouska modified the decree. But the appellate court did not seem to appreciate the effect of the discharge on that third kind of debt—the hold-harmless obligation that Clarence may have owed Margery under the decree of divorce. In its opinion it uses the words *made liable* in a sense that overlooks any hold-harmless debt:

> In the journal entry reforming the divorce decree, the district court stated that Clarence "was discharged [by the bankruptcy court] from all individual indebtedness and all joint marital indebtedness on February 27, 1995." Thus, the district court recognized that Clarence's portion of the joint debts had been discharged; however, *Margery was then made liable on those debts*, notwithstanding the provisions of the original divorce decree and Clarence's assurances that he would assume and pay the joint debts of the parties.[16]

Margery was not *made liable* by Clarence's discharge. The joint unsecured debts repre-

---

**14.** *In re Marriage of Beardslee*, 22 Kan.App.2d 787, 793, 922 P.2d 1128, 1133 (1996) (citations omitted).

**15.** United States District Courts have original *but not exclusive jurisdiction* over civil proceedings arising under title 11, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). Bankruptcy courts derive their powers by delegation from district courts. 28 U.S.C. § 157(a).

**16.** *In the Matter of the Marriage of Beardslee*, 22 Kan.App.2d at 793, 922 P.2d at 1133 (emphasis added).

sented prebankruptcy obligations of both Margery and Clarence. Margery had been liable on the joint unsecured debts long before the bankruptcy case was filed. The decree's assignment of these debts to Clarence did not remove Margery's obligation to pay them. All Clarence's discharge did was make it clear that Clarence would not have to pay the joint unsecured debts and that Margery would under her original obligation to the creditors. In this sense only was Margery *made liable* by Clarence's discharge from his obligation to pay those debts. But if Clarence owed Margery a hold-harmless debt under the decree, that prepetition debt was also discharged. However, the appellate court made no mention of the effect of the discharge on any debt Clarence owed Margery under the decree.

· Next, the Court of Appeals said that because the bankruptcy court granted stay relief, the divorce court was free to make orders dealing with the homestead:

> Because the bankruptcy court lifted the automatic stay, the district court had the right to make orders dealing with the homestead since it was not a part of the bankruptcy estate.[17]

As far as it goes this statement is true, but it does not go far enough. The divorce court could require the sale of Clarence's homestead and the *in rem* satisfaction of the mortgages against it without violating the discharge injunction. But, it could not properly require Clarence to pay a discharged debt to Margery as a personal liability by appropriating the proceeds of his equity in the home.

Finally, the appellate court laid down this overly broad rule for bankruptcy cases in divorce court:

> [W]here one of the joint debtors in a divorce action has been discharged from a marital debt in bankruptcy, the district court has the authority to order that debt to be paid from the marital assets.[18]

This statement would be true if a court found the discharged party had no duty to hold the nonbankrupt spouse harmless on the obligation to pay the joint debts. In such a

case, the discharge could not operate because there would be no debt between the ex-spouses for it to operate on. Therefore, the discharge injunction would not apply to prevent the divorce court from taking an entire exempt homestead previously awarded to one of the spouses. But if the bankrupt spouse owes a prepetition debt to the ex-spouse, the discharge extinguishes that debt. And the discharge injunction enjoins that ex-spouse and the state divorce court from collecting the discharged debt from an unencumbered equity in a residence awarded to the debtor spouse in the divorce.

■ Under our federal system of government, state courts must give effect to federal laws even though they perceive the result to be unfair. This is the command of the Supremacy Clause, U.S. CONST. art. VI, cl. 2. Although aware of Clarence's discharge, the state courts here appear not to have examined whether Clarence owed Margery a dischargeable debt under the decree. Nevertheless, the state court rulings must stand under the Rooker–Feldman doctrine.

### Rooker–Feldman Doctrine

■ The Rooker–Feldman doctrine springs from two United States Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine recognizes that United States District Courts are courts of original jurisdiction, not courts of appellate jurisdiction. Accordingly, when a state court has jurisdiction to decide a federal question, a United States District Court has no subject matter jurisdiction to review the state court's decision on that question. And, of course, the federal court may raise the issue of subject matter jurisdiction *sua sponte*. *See Rockwell Int'l Credit Corp. v. United States Aircraft Ins. Group*, 823 F.2d 302 (9th Cir.1987).

Congress granted the district courts original and exclusive subject matter jurisdiction over all cases under Title 11, i.e., bankruptcy cases.[19] However, as to civil proceedings

17. *Id.*

18. *Id.*

19. 28 U.S.C. § 1334(a).

arising under, arising in, or related to bankruptcy cases, the district courts' subject matter jurisdiction is not exclusive.[20]  Therefore, state courts can have subject matter jurisdiction over civil proceedings arising under, arising in, and related to bankruptcy cases.

To permit bankruptcy courts to function, Congress also provided that the district courts may refer to the bankruptcy judges for the district any or all bankruptcy cases and any or all proceedings arising under, arising in, or related to bankruptcy cases.[21] Like all United States District Courts, the Kansas district court has referred all bankruptcy cases and all civil proceedings to the bankruptcy judges of the district in an order of general reference.  Since the bankruptcy judges' jurisdiction is derived from that of the district court, their subject matter jurisdiction is likewise nonexclusive as to civil proceedings connected with bankruptcy.

Ordinarily this Court would have subject matter jurisdiction under 28 U.S.C. § 1334, as effectuated by the general reference order of the District Court effective July 10, 1984 (D.Kan.Rule 83.8.5).  And this adversary proceeding would be considered a core proceeding under 28 U.S.C. § 157(b)(2)(I), since it involves a determination of the effect of a Bankruptcy Code provision on discharge of a particular debt.  However, since the Rooker–Feldman doctrine applies here, these principles do not control.

The Court's research discloses six recent bankruptcy cases that have applied the doctrine in various contexts: *In re Audre, Inc.,* 202 B.R. 490, 494 (Bankr.S.D.Cal.1996); *In re Keenan,* 201 B.R. 263, 264–66 (Bankr. S.D.Cal.1996); *DuFrayne v. FTB Mortgage Services, Inc. (In re DuFrayne),* 194 B.R. 354, 368–69 (Bankr.E.D.Pa.1996); *Morrow v. Torrance Bank (In re Morrow),* 189 B.R. 793, 808–11 (Bankr.C.D.Cal.1995); *In re Highway Truck Drivers and Helpers, Teamsters Local No. 107,* 100 B.R. 209, 216 (Bankr.E.D.Pa.1989); and *Goetzman v. Agribank, FCB (In re Goetzman),* 91 F.3d 1173, 1176–78 (8th Cir.1996).  And it discloses three other bankruptcy cases that have referred to the doctrine in footnotes: *Betty* *Owen Schools, Inc. v. U.S. Dept. of Educ. (In re Betty Owen Schools, Inc.),* 195 B.R. 23, 33 n. 18 (Bankr.S.D.N.Y.1996); *In re Herrera,* 194 B.R. 178, 186 n. 3 (Bankr.N.D.Ill.1996); *In re Wrobel,* 197 B.R. 289, 294 n. 4 (Bankr. N.D.Ill.1996).

Among the cited cases, *In re Goetzman* is the most similar to this case.  The Goetzmans were Minnesota farmers who had granted a mortgage on their farm that Agribank held at the time of their Chapter 12 filing.  Because the value of the farm land was less than the mortgage debt, Agribank was an undersecured creditor.  The Goetzmans and Agribank entered into a stipulation that was made a part of a debt adjustment plan.  Following confirmation of the plan, the court granted the Goetzmans a discharge under § 1228(a) and closed the case.  Later, the Goetzmans and Agribank disagreed over the amount of the debt under the stipulation.  Rather than return to the bankruptcy court, the Goetzmans sued Agribank in Minnesota state court for specific performance of the stipulation and tendered into court the amount they thought they owed as full payment.  Agribank sued to foreclose its mortgage, and the cases were consolidated for trial.  The issue was the amount the Goetzmans owed under the stipulation.

After a jury trial, the state court entered findings of fact and conclusions of law fixing the debt at $741,627.30.  The Goetzmans appealed to the Minnesota Court of Appeals, which affirmed.  When the Court of Appeals rejected the Goetzmans' appeal, they sought and were denied review by the Minnesota Supreme Court.

During the pendency of the appeal, the Goetzmans brought an adversary complaint in the Chapter 12 bankruptcy case seeking a determination of the amount of the debt.  However, they couched the issue somewhat more elaborately as a request for a determination of the "amount of the real estate lien represented by the unsecured portion of the lien and subsequently discharged in the underlying Goetzman bankruptcy discharge."[22] The bankruptcy court believed it had subject

---

**20.**  28 U.S.C. § 1334(b).

**21.**  28 U.S.C. § 157(a).

**22.**  *Goetzman,* 91 F.3d at 1176.

matter jurisdiction over the adversary proceeding because the proceeding either arose under or arose in or was related to the Title 11 case. After discussing collateral estoppel and res judicata, the bankruptcy court dismissed the complaint noting: "[F]undamentally, the issue became what was the amount of debt and is that [debt] secured by the property." [23]

The district court reversed in part, holding that the bankruptcy court lacked subject matter jurisdiction based on the Rooker–Feldman doctrine. It dismissed the case on the ground that the Goetzmans were actually seeking federal review of a state court determination.

On appeal, the 8th Circuit Court of Appeals affirmed, relying on the "inextricably intertwined" test of Rooker–Feldman:

> Although the state and federal claims may not be identical, impermissible appellate review may occur when a federal court is asked to entertain a claim that is "inextricably intertwined" with the state court judgment.[24]

Explaining this test, the court said that if the "federal claim of right" succeeds only to the extent that the state court wrongly decided the issues before it, that claim is inextricably intertwined with the state court judgment and the requested federal relief is indistinguishable from an appeal of the state court ruling:

> [T]he federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.[25]

Although the Goetzmans' adversary complaint sought to frame the issue in terms of whether a portion of the debt to Agribank was discharged in bankruptcy, the Circuit Court found the Goetzmans' "federal claim of right" was inextricably intertwined with the state court decision because the heart of the state court decision was a determination of the amount of the debt owed to Agribank. The court held that what the Goetzmans really sought was a federal judgment that would change the state court result, a result that would have been appealable as a federal question.

The federal claim aspect of the case before Judge Bouska was about whether Clarence owed Margery a debt that was discharged in his bankruptcy with the result that collection of the debt as a personal liability was barred by the discharge injunction. The discharge issue was presented to both the trial and appellate courts, although perhaps not as well presented at the trial level as it could have been. In state trial court, Clarence had an opportunity to argue that appropriating his equity in the residence to pay the joint unsecured debts was tantamount to collecting a discharged debt from him as a personal liability; the discharged debt was his hold-harmless obligation to Margery under the decree of divorce. When unsuccessful, as he was, Clarence's remedy was to seek review from the U.S. Supreme Court on the federal question of discharge under § 727 of the Bankruptcy Code. 28 U.S.C. § 1257.

The federal claim presented in this adversary proceeding is about stopping the sale because it was ordered contrary to the discharge of Clarence's debt to Margery. Clarence can only succeed on his claim here to the extent that the state court wrongly decided that he had not been discharged on that debt. He wants a federal ruling that overturns the state court result.

If Margery violated the discharge injunction, to permanently enjoin her now would, in effect, nullify the state court judgment. Under Rooker–Feldman, this Court has no subject matter jurisdiction to review the state court decision. Therefore, Clarence's motion for summary judgment is denied, and Margery is released from the Court's prior order of March 27, 1997, which temporarily en-

---

23. *Id.*

24. *Id.* at 1177.

25. *Goetzman*, 91 F.3d at 1177, citing *Keene Corp. v. Cass*, 908 F.2d 293, 296–97 (8th Cir.1990) (citation omitted).

joined her from enforcing the state court order.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a).

A judgment reflecting this ruling shall be entered on a separate document in compliance with Fed.R.Bankr.P. 9021 and Fed. R.Civ.P.58.

IT IS SO ORDERED.

## APPENDIX A

### IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
### CIVIL COURT DEPARTMENT

In the Matter of the Marriage of:
MARGERY A. BEARDSLEE and
CLARENCE E. BEARDSLEE

Case No. 93C00594
Court No. 9
K.S.A. Chapter 60

### RESPONDENT'S PROPOSED DIVISION OF ASSETS AND LIABILITIES

COMES NOW the respondent, by and through his attorney, Donna M. Manning, and submits the following proposal for division of assets and liabilities:

### Assets

| Wife | | | Husband |
|---|---|---|---|
| | | House | $104,000.00 |
| | | First mortgage | 62,200.00 |
| | | Second mortgage | 22,279.00 |
| | | 8% sales costs | 8,320.00 |
| | | | 11,201.00 |
| | * | pre-marital | 3,249.00 |
| | | difference | 7,952.00 |
| | | 1979 Corvette | 10,000.00 |
| | * * | KPERS | 20,493.72 |
| 88 Mercedes | 14,000.00 | pre-marital | 409.37 |
| | | | 20,084.35 |
| Jewelry: | | * * TIAA | 40,513.69 |
| 3k Tennis Bracelet | 1,800.00 | pre-marital | 1,000.00 |
| | | | 39,513.69 |
| Diamond Earrings | | Tools | 1,000.00 |
| .33 ea. | 300.00 | * * IRA | 10,571.21 |
| Diamond Necklace | 500.00 | | $89,121.25 |
| Diamond Ring | 3,800.00 | | |
| Diamond Bracelet | 900.00 | | |
| Pearl and Diamond | | | |
| Earrings | 900.00 | | |
| Gold Ring | 1,500.00 | | |
| 2 watches | 350.00 | | |
| | 9,400.00 | | |
| * * 401K | 4,897.84 | | |
| Household Furnishings: | | | |
| Kitchen ware and appliances | 2,000.00 | * Premarital investment | |
| Sofa and Loveseat | 795.00 | | |
| 4 tables | 264.00 | H – 12,872 | Sale Proceeds |
| 2 lamps | 180.00 | 1,000 | Earnest money |
| VCR | 450.00 | 13,872 | |
| TV | 495.00 | | |
| Patio Set | 280.00 | W – 15,383 | |
| Mattress and Box springs | 198.00 | (4,750) | to sister |
| Sofa Table | 130.00 | 10,623 | |
| Desk, shelving and coffee table | 800.00 | | |
| | 5,592.00 | * * Not discounted by Taxes | |

Miscellaneous:

| | |
|---|---|
| Camera Equipment | 2,000.00 |
| Gucci and Coach and other bags | 1,000.00 |
| Lawn Boy mower | 300.00 |
| | 3,300.00 |
| | $37,189.84 |

## Liabilities

| Wife's Individual Accounts | | Husband's Individual Accounts | |
|---|---|---|---|
| Discover | $2,972.00 | American Express | $ 9,451.31 |
| Dillards | 341.43 | American Express | 4,801.20 |
| Sears | 102.18 | Boatmen's | 2,658.45 |
| JC Penney | 139.03 | Mercantile MC | 2,275.09 |
| Montgomery Ward | 347.88 | Mercantile VISA | 4,524.75 |
| Jones | 404.06 | TIAA | 13,771.72 |
| Jones | 1,193.82 | | |
| | $5,500.40 | | $37,282.52 |

### * Joint Liabilities

| | | |
|---|---|---|
| IRS 1990 | | $ 688.00 |
| HFC | | 3,726.95 |
| | | (now 6,393.00) |
| CNB Mastercard | | 2,794.63 |
| CNB Visa | | 3,372.91 |
| MBNA | | 11,803.02 |
| | | $22,385.51 |
| $31,689.44 | | $29,453.22 |

* Husband's proposal to assume all joint debts is contingent upon being awarded the marital residence. If the real estate is set aside to Wife, Husband proposes to equally divide the joint liability.