No. 98-716

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 67

299 Mont.78

996 P. 2d 389

SHAWN LEE,

Plaintiff and Respondent,

v.

LISA KERRY LEE, a.k.a. LISA KERRY JOHNSON,

Defendant and Appellant

APPEAL FROM: District Court of the Twenty-First Judicial District,

In and for the County of Ravalli,

The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD

For Appellant:

Lisa K. Johnson, Lolo, Montana, *pro se*

For Respondent:

Richard R. Buley, Tipp and Buley, Missoula, Montana

Submitted on Briefs: June 6, 1999

Decided: March 16, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.Lisa Kerry Lee, a.k.a. Lisa Kerry Johnson (Johnson), appeals from a judgment issued by the Twenty-First Judicial District Court, Ravalli County, in favor of Shawn R. Lee (Lee). The June 15, 1998 judgment awarded Lee $12,178 pursuant to Johnson's and Lee's 1996 dissolution decree, offset maintenance owed by Lee, and further adjudged Johnson guilty of contempt, and ordered her to serve 24 hours in the Ravalli County Jail.

¶2.We affirm, and remand for the determination of fees and costs.

## Factual and Procedural Background

¶3.This matter came before the Ravalli County District Court on June 2, 1998, for a show cause hearing on Lee's motion that Johnson should be found in contempt for her failure to comply with a 1996 dissolution decree. Following the hearing, the court on July 15 issued a $12,178 judgment in favor of Lee. The money judgment included an offset for maintenance that Lee owed Johnson. Under Lee's and Johnson's 1996 dissolution decree, Lee was responsible for annual maintenance payments of $100 for five years, as well as $686 in back-due temporary maintenance payments. The court also held Johnson in direct contempt for her "deceitful pleadings filed in this matter and for her deceitful omission," and sentenced her to 24 hours in the Ravalli County jail.

¶4.The contempt order as well as the money judgment resulted from Johnson selling a horse and a horse trailer that should have been transferred to Lee, keeping the proceeds, and subsequently not informing Lee, Lee's counsel, her own counsel, the District Court, or this Court, that she had done so--all the while assuring or leading the respective tribunals to believe that the property would not be sold.

¶5.The events that culminated with the above judgment and finding of contempt can be

traced to March 19, 1996, when the same court issued a final decree of dissolution in the marriage of Lee and Johnson. The couple had been separated since 1994; Johnson currently resides in Missoula County, Montana, and Lee resides in California.

¶6.As part of the distribution of the marital estate, the court ordered that Johnson return within 30 days to Lee a quarter horse purchased in 1986 and a horse trailer purchased in 1990. The horse was worth approximately $6,500 at the time, and the trailer, although not given a specific value, had been purchased for $6,900. Unbeknownst to Lee or the court, however, Johnson had already sold the horse and kept the proceeds, which she claimed were applied to "house payments" and "outstanding bills." The court's dissolution decree determined that at the time Johnson was earing $1,600 a month as a business manager.

¶7.On April 19, 1996, Johnson filed a notice of appeal to this Court. On May 10, 1996, Lee filed a motion with the District Court to enforce judgment and requested a writ of assistance in an effort to compel Johnson to turn over the horse and horse trailer.

¶8.On June 18, 1996, Johnson, who was then unemployed, filed a motion for stay of execution of judgment pending appeal. In her supporting affidavit, she claimed that the items she had not turned over to Lee, the horse and the trailer, were "the only assets of substance that remain in my hands since separation." She further claimed that the items were "irreplaceable and not subject to ready valuation" and that the items "will be cared for during this appeal." On that same day, Lee renewed his request for writ of assistance in compelling Johnson to turn over the horse and trailer.

¶9.The court denied Johnson's motion for a stay of execution and granted Lee's request for a writ of assistance on July 29, 1996. Johnson subsequently filed a motion and brief for stay of judgment with this Court on August 7, 1996. Johnson renewed her assertion that the horse and the trailer would be "cared for during this appeal." Further, she stated:

The horse means a great deal to Johnson and it could possibly be lost forever without this Court's relief . . . .[T]he horse trailer and the horse will not decline in value. Lisa would keep the horse and the horse trailer in a condition that would preserve their value. The Respondent would not be harmed or prejudiced by a stay pending appeal.

On August 27, 1996, this Court granted Johnson's motion for a stay of judgment based on her assurances, ordering that "the horse and trailer now in the appellant's possession may not be sold during the pendency of this appeal."

¶10.This Court issued its decision on May 13, 1997, affirming the District Court's findings of fact, conclusions of law, and final decree and other orders issued in this matter. *See In re Marriage of Lee* (1997), 282 Mont. 410, 938 P.2d 650. Apparently, while the appeal was before this Court, Johnson sold the horse trailer on May 2, 1997, although she claimed that the sale did not actually occur until after this Court's decision was handed down. In June, Lee renewed his effort to execute on the horse and trailer, and filed a show cause motion for contempt.

¶11.On July 29, 1997, Johnson served Lee with a notice of automatic stay, subsequent to her filing a Chapter 7 petition for bankruptcy. In turn, Lee was compelled to bring action in the bankruptcy proceedings in order to claim that Johnson's debt subject to the dissolution decree was not dischargeable. On December 17, 1997, the U.S. Bankruptcy Court for the District of Montana issued a judgment in favor of Lee, concluding that the dissolution decree debt owed to him, namely the horse and trailer, was non-dischargeable, under 11 U.S.C. § 523(a)(15).

¶12.Once the bankruptcy court issued its "discharge of debtor" on March 18, 1998, which terminated the automatic stay, Lee filed another show cause motion to hold Johnson in contempt and for an "examination of judgment debtor" on April 21, 1998. He specifically requested that the court determine why Johnson should not be held in contempt for failing to turn over the horse and trailer, and that she respond to questions concerning her assets. Further, he requested that the court determine if any debts that Lee owed Johnson had been discharged. In his supporting affidavit, Lee stated that at the September 4, 1997 meeting of creditors involved with Johnson's bankruptcy proceedings, she had testified that she had in fact transferred title to the horse to a third party and had sold the trailer.

¶13.The District Court ordered on May 4, 1998, that a show cause hearing take place on June 5, 1998. This date was eventually rescheduled for June 2, 1998.

¶14.Following the hearing, the District Court found that Johnson had, indeed, sold the horse on March 1, 1996, prior to the March 19 decree of dissolution ordered by the court. The court further found that Johnson sold the horse trailer sometime in May of 1997, during which time she was under an order from this Court not to dispose of either the horse or the trailer.

¶15.The court concluded that Johnson should be held in direct contempt for her "deceitful omission" in not at any time explaining to the court or Lee that she had first sold the horse

and then the horse trailer. The court stated that it did not find Johnson's "explanations for her contemptuous actions genuine, compelling, or excusable, and therefore found her to be guilty of direct contempt and under § 3-1-519, MCA, properly punished her by imprisoning her in the Ravalli County jail for 24 hours."

¶16.In calculating the money judgment, the court determined that the horse was worth $6,500, pursuant to the 1996 dissolution decree, and the trailer was worth $4,500, which apparently was the sum Johnson received in 1997. Further, the court determined that as a result of Johnson's bankruptcy action, approximately $3,000 in credit card debt, which had been assigned to Johnson under the 1996 dissolution decree, had been discharged. Because the credit card debt was under jointly held accounts, however, this debt had shifted to Lee, in contravention of the court's 1996 decree. Thus, the court required that Johnson compensate Lee for this obligation as well. From this total, the court then deducted approximately $1,800, offsetting amounts that Lee owed Johnson for maintenance, and that Johnson had previously paid to Lee. The court arrived at a figure of $12,178, representing a fixed sum that Johnson owed Lee pursuant to their dissolution decree. Both parties stipulated to this amount in court. Finally, the court denied attorney fees to Lee, concluding that Johnson did not have any present ability to pay.

¶17.Following the foregoing disposition, on June 8, 1998, Lee received $5,000 from a bonding company resulting from Johnson's sale of the horse trailer. In pursuing sale of the trailer, which Johnson and Lee held jointly, she arranged for her father, a public notary, to notarize Lee's signature without Lee's knowledge that the trailer would be sold. Johnson's father's bonding company subsequently paid a claim made by Lee. Johnson raised this issue during the hearing and moved to amend judgment, claiming the $12,178 judgment in favor of Lee should be offset by this amount. Additionally, Johnson claimed that the judgment should also be offset by $3896.93, which represented the amount of her credit card debt discharged as a result of the bankruptcy proceedings that the court had reapplied to her obligation to Lee. This motion was deemed denied by the District Court as of October 3, 1998.

¶18.Johnson appeals the judgment of the District Court as well as the denials of her motions to amend the judgment.

## Standard of Review

¶19.Our standard for review of contempt orders, pursuant to our granting a writ of

certiorari, is first to determine whether the court which found contempt acted within its jurisdiction and, second, to determine whether there is substantial evidence to support the findings of the court. *Kauffman v. Twenty-First Judicial Dist. Court*, 1998 MT 239, ¶ 16, 291 Mont. 122, ¶ 16, 966 P.2d 715, ¶ 16. Similarly, we have held that under a "family law" exception, our review on direct appeal of a judgment and orders made in cases of contempt is limited to first, whether the district court acted within its jurisdiction, and, second, whether the evidence supports the findings of the court. *See In re Marriage of Sullivan* (1993), 258 Mont. 531, 539-40, 853 P.2d 1194, 1200.

¶20.In order for a court to act within its jurisdiction, it must have: (1) cognizance of the subject matter; (2) presence of the proper parties; and (3) the court's action must be invoked by proper pleadings and the judgment within the issues raised. *State ex rel. Porter v. First Judicial Dist.* (1950), 123 Mont. 447, 454, 215 P.2d 279, 283. A court lacks or exceeds such jurisdiction by "any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis . . . ." *See* 14 Am.Jur.2d, *Certiorari* § 9 (1964). Our standard of review of a district court's findings is whether substantial evidence supports those findings. *In re Marriage of Nevin* (1997), 284 Mont. 468, 472, 945 P.2d 58, 61 (citation omitted). Substantial evidence is the amount of relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Nevin*, 284 Mont. at 472, 945 P.2d at 61 (citation omitted).

## DISCUSSION

¶21.On appeal, Johnson raises eight issues. The first four address the contempt order issued by the District Court, which did not include a fine; rather, the contempt obligation was apparently discharged by her 24-hour incarceration in the Ravalli County jail. The latter four pertain to the District Court's offset of Lee's maintenance obligations to Johnson, including the claim that proceeds received by Lee from a notary's bonding company should offset the judgment. In his response brief, Lee requests that this Court dismiss Johnson's appeal, and award his costs and attorney's fees for defending what he characterizes as a "meritless appeal." Lee further requests that we hold Johnson in contempt as well.

¶22.Due to the potentially dispositive nature of the contempt appeal, we first consolidate and address those issues including the following preliminary discussion

## *I. Contempt*

¶23. Lee argues that Johnson's appeal is not properly before this Court because she has failed to obtain a writ of certiorari or "writ of review" from this Court under § 27-25-102, MCA. This Court has identified three "indispensable" requisites to the granting of the writ of certiorari that "must co-exist": (1) excess of jurisdiction; (2) absence of the right to appeal; and (3) lack of a plain, speedy and adequate remedy other than certiorari. *See generally State ex rel. Lay v. District Court* (1948), 122 Mont. 61, 69, 198 P.2d 761, 765; *City of Helena v. Buck* (1991), 247 Mont. 313, 315, 806 P.2d 27, 29. Pursuant to § 3-1-523, MCA:

The judgment and orders of the court or judge made in cases of contempt are final and conclusive. There is no appeal, but the action of a district court or judge can be reviewed on a writ of certiorari by the supreme court or a judge thereof . . . .

Thus, pursuant to Rule 1(b), M.R.App.P., a party may appeal from civil judgment or order, "*except when expressly made final by law.*" Lee contends that this Court should follow the plain language of the statute and conclude that the district court's judgment and orders are not appealable in this instance, because Johnson has not petitioned this Court for a writ of certiorari. If so, then under the plain language of the statute *all* of the judgment and *all* of the orders issued by the District Court--including those related to the money judgment-- would be final and this Court would not have jurisdiction to review any portion of Johnson's appeal. Accordingly, Lee requests that we dismiss Johnson's appeal in its entirety.

### *A. The Family Law Exception*

¶24. As Johnson correctly points out, however, although the judgment and orders resulting from contempt cases are by statute reviewable only pursuant to a writ of certiorari, this Court has judicially created an exception in "family law" cases. By no means is creating such an exception without precedence. In the past, we have reviewed contempt cases subsequent to this Court granting writs of habeas corpus, and writs of supervisory control. *See Gillispie v. Sherlock* (1996), 279 Mont. 21, 23, 929 P.2d 199, 200 (stating that contempt proceeding may be reviewed under a petition for writ of habeas corpus if the person seeking review is incarcerated at the time petition is filed); *State ex rel. Anderson v. District Court* (1980), 188 Mont. 77, 79, 610 P.2d 1183, 1185 (concluding that pursuant to this Court's general supervisory powers over all other courts under Article VII, Section

2, of the Montana Constitution, a writ of supervisory control may be granted in contempt cases when the party is barred from using a writ of certiorari).

¶25.The "family law" exception that Lee encourages us to reject in this instance was approved by this Court as recently as 1998. *See In re Marriage of Baer*, 1998 MT 29, ¶ 42, 287 Mont. 322, ¶ 42, 954 P.2d 1125, ¶ 42. We have expressly extended this "family law" exception to dissolution of marriage proceedings. *See In re Marriage of Sessions* (1988), 231 Mont. 437, 441, 753 P.2d 1306, 1308. Contrary to Lee's argument, this exception has never been narrowly drawn to cases exclusively involving child custody, visitation, or maintenance where "it would be easier to handle all the issues in an appeal rather than through a writ of review for contempt." *See*, *e.g.*, *In re Marriage of Smith* (1984), 212 Mont. 223, 226, 686 P.2d 912, 914 (addressing contempt for nonpayment of "marital debt").

¶26.The "family law" exception to the writ of certiorari mandate of § 3-1-523, MCA, is, however, of recent vintage. For example, in a 1928 divorce case, *Hanson v. Hanson*, the plaintiff husband was cited for contempt for failing to comply with the terms of a divorce decree. The court found him not guilty, and dismissed the contempt. On his wife's direct appeal, this Court stated that "in the face of section 9921, R.C. 1921, which provides in part that 'the judgment and orders of the court or judge, made in cases of contempt, are final and conclusive, and there is no appeal' nothing remains for us to do but to dismiss the attempted appeal and it is so ordered." *Hanson v. Hanson* (1928), 83 Mont. 428, 429, 272 P. 543 (per curiam).

¶27.Thirty years later, in *Application of Nelson,* a dissenting Justice noted that although "there is a right of appeal from the court's order of October 9, 1957, modifying the [divorce] decree, yet, by virtue of the express provisions of R.C.M. 1947, Sec. 93-9814, 'there is no appeal' from the court's subsequent order adjudging the petitioner Nelson guilty of contempt and sentencing him to imprisonment therefor." *Application of Nelson* (1957), 132 Mont. 252, 257, 316 P.2d 1058, 1060-61 (Adair, J. dissenting) (addressing writ of habeas corpus).

¶28.The foregoing code provisions, § 93-9814, RCM (1947), and its precursor, § 9921, Rev.C. (1921 & 1935), would in 1979 be codified verbatim under § 3-1-523, MCA.

¶29.Initially, this Court's interpretation of § 3-1-523, MCA, followed the same historical course. For example, in a terse 1979 decision, *O'Neill v. O'Neill*, we dismissed an appeal

where no writ of certiorari had been granted, and stated that the district court's "inherent" contempt power "must be exercised . . . with the knowledge that it will not be upset on appeal . . . . [t]his is necessary to preserve the dignity and authority of the court." *O'Neill v. O'Neill* (1979), 184 Mont. 415, 417, 603 P.2d 257, 258 (dismissing husband's appeal of contempt order for failure to pay child support). Then, in a 1982 decision brought by a father seeking to modify his parental visitation rights, this Court again followed the statutory rule, that the "proper avenue to use to gain review of a contempt order, by this Court, is a writ of certiorari." *Milanovich v. Milanovich* (1982), 200 Mont. 83, 87, 655 P.2d 959, 961 (dismissing appeal). This Court, in fact, reviewed the very same claim once the father properly petitioned and was granted a writ of certiorari. *See Milanovich v. Milanovich* (1982), 201 Mont. 332, 655 P.2d 963. In this latter decision, we explained the underlying public policy, that "the best remedy to insure respect for the law and the orderly progress of relations between family members split by dissolution is to give effect to the contempt powers of the District Court." *Milanovich*, 201 Mont. at 336, 655 P.2d at 965. Three years later, in a child custody modification case, we again followed earlier precedent and the express language of § 3-1-523, MCA, in dismissing a father's direct appeal of a district court's contempt order. *See In re Marriage of Robbins* (1985) 219 Mont. 130, 136, 711 P.2d 1347, 1350.

¶30.Three years later, however, this Court concluded that the writ of certiorari requirement could, indeed, be suspended in "dissolution of marriage proceedings," and a court's contempt order could be challenged on direct appeal. *Sessions*, 231 Mont. at 441, 753 P.2d at 1308 (affirming district court's contempt order). We stated that "[a]lthough contempt of court orders by the District Court are final and usually unreviewable by this Court in any manner except by writ of certiorari, § 3-1-523, MCA, an exception is made in dissolution of marriage proceedings." For this proposition we cited to an earlier decision, *In re Marriage of Smith* (1984), 212 Mont. 223, 686 P.2d 912. In *Smith*, the party appealed a district court's order which had *denied* her petition to hold her former husband in contempt for non-payment of marital debt--an order we ultimately affirmed. We offered no clue as to why this exception--rather suddenly--should be adopted into Montana jurisprudence. We merely stated that "[w]e permit an exception to this rule, however, in dissolution of marriage proceedings and we consider the subject by way of appeal." *Smith*, 212 Mont. at 225-26, 686 P.2d at 914. Curiously, the same justice who established this exception in *Smith* in 1984 also penned the 1985 *Robbins* decision which followed earlier precedent and the writ of certiorari mandate of § 3-1-523, MCA.

¶31.Remarkably, seven months after this Court decided *Sessions* in 1988, we offered the

following rule analysis in yet another "family law" case:

William raises a threshold question in his brief. He argues that Jan is attempting to appeal a contempt order, which is not allowed. Section 3-1-523, MCA, states contempt orders are final and conclusive, and may not be appealed. Review may be had only on a writ of certiorari by this Court. We have held this statute applicable in dissolution cases.

*In re Marriage of Harper (1988), 235 Mont. 41, 44, 764 P.2d 1283, 1285 (concluding that although husband moved for contempt, district court issued no contempt order; thus, order modifying custody was appealable by wife). By 1988, two distinct lines of authority existed: one following the clear mandate of the statute and well-grounded in Montana case law; the other carving out an exception with no indication of authority or public policy that may have factored into its adoption.*

¶32.Five years later, this Court turned in favor of the precedent established in *Sessions* and *Smith*, which has been the uncontested authority ever since. We stated:

Pursuant to § 3-1-523, MCA, contempt of court orders issued by a district court are final and usually unreviewable by this Court except by way of a writ of certiorari or review. However, an exception exists for contempt of court orders made in dissolution of marriage proceedings. *In re Marriage of Sessions* (1988), 231 Mont. 437, 441, 753 P.2d 1306, 1308; citing *In re Marriage of Smith* (1984), 212 Mont. 223, 225-26, 686 P.2d 912, 914. Therefore, the contempt of court order in this case is properly before the Court for review.

*In re Marriage of Boharski (1993), 257 Mont. 71, 77, 847 P.2d 709, 713. See also In re Marriage of Sullivan (1993), 258 Mont. 531, 539-40, 853 P.2d 1194, 1200 (citing In re Marriage of Sessions); In re Marriage of Prescott (1993), 259 Mont. 293, 296-97, 856 P.2d 229, 231 (citing In re Marriage of Boharski); In re Pedersen (1993), 261 Mont. 284, 289, 862 P.2d 411, 414 (citing In re Marriage of Prescott); Woolf v. Evans (1994), 264 Mont. 480, 483, 872 P.2d 777, 779 (citing In re Pedersen); In re Marriage of Dreesbach (1994), 265 Mont. 216, 223-24, 875 P.2d 1018, 1022-23 (citing In re Marriage of Boharski); Heath v. Heath (1995), 272 Mont. 522, 527, 901 P.2d 590, 593 (citing Woolf v. Evans); In re Marriage of Nevin (1997), 284 Mont. 468, 471, 945 P.2d 58, 60 (citing Heath); In re Marriage of Baer, 1998 MT 29, ¶ 42, 287 Mont. 322, ¶ 42, 954 P.2d 1125, ¶ 42 (citing Dreesbach and Boharski).*

## B. Contempt Policy

¶33.Nevertheless, the clear policy enunciated in *Milanovich* should not be buried beneath the weight of the foregoing *stare decisis*. Indeed, where parties are reluctant to abide by orders pertaining to custody, child support, maintenance, and property division, "the best remedy to insure respect for the law and the orderly progress of relations between family

members split by dissolution is to give effect to the contempt powers of the District Court." *Milanovich*, 201 Mont. at 336, 655 P.2d at 965. *See also State ex rel. Rankin v. District Court* (1920), 58 Mont. 276, 288, 191 P. 772, 774 (stating contempt power "must be exercised to its fullest extent to enable the court to discharge its high duty of administering justice between parties whose rights are put in issue before it, or to enforce these rights after they have been determined").

¶34. We conclude that the foregoing statements of policy apply to all matters flowing from marital dissolution and child custody disputes, which obviously encompasses the case *sub judice*. Thus, this Court concludes that it would be poor public policy to create circumstances whereby a district court's contempt power, in enforcing the rights of the parties before it, is in any manner diminished by one party's ability to file a direct appeal that, in turn, frivolously and needlessly delays his or her compliance with the lower court's judgment and orders. To this end, our discretion to grant or deny a petition for certiorari-- or supervisory control for that matter--undoubtedly is far more efficient and effective in upholding the "family law" policy set forth in *Milanovich*. It is therefore imperative that the "family law" direct appeal exception be well-defined and properly narrowed once and for all in light of the foregoing policy.

## C. The Ancillary Order Exception

¶35. The need for a direct appeal approach in some family law cases is warranted for the same reason that the writ of supervisory control exception, identified above, has been permitted in some instances. In authority relied on in setting forth the policy in the second *Milanovich* decision, this Court identified two distinct circumstances from which a finding of contempt can be challenged: (1) where the court acts without jurisdiction, and (2) in "exigent cases where the court acts *within jurisdiction*, but in a manner so arbitrary and unlawful as to be tyrannical . . ." *State ex rel. Zosel v. District Court* (1919), 56 Mont. 578, 581-82, 185 P. 1112, 1113 (emphasis added). This latter standard requires that the errors committed must prejudice the substantial rights of the party. *See generally State ex rel. Coleman v. District Court* (1915), 51 Mont. 195, 200, 149 P. 973, 975 (reviewing contempt order pursuant to writ of supervisory control).

¶36. Conceivably, in the context of contentious custody and dissolution disputes where parental and property rights are at stake, an order of contempt not exceeding the issuing court's jurisdiction may include an ancillary order so "arbitrary and unlawful as to be tyrannical." This Court has held that a writ of certiorari, however, cannot be used to

correct errors within the lower court's jurisdiction. *See Buffalo v. Thiel* (1984), 213 Mont. 280, 691 P.2d 1343. In *Buffalo* we stated that:

[T]he lack of jurisdiction must be distinguished from an erroneous decision made by a court in exercising the jurisdiction it possessed. If a court is acting within its jurisdiction, it has the power to decide erroneously as well as correctly. If an erroneous decision is made in such a case, it is not void and only subject to correction on *appeal or by a writ of supervisory control.*

*Buffalo, 213 Mont. at 284, 691 P.2d at 1345 (emphasis added) (citations omitted). Our decision in Harper illustrates the foregoing rationale. Ultimately, we reversed and remanded the district court's erroneous modification of the Harpers' earlier child support and visitation agreement. Nevertheless, we identified the "threshold question" of whether § 3-1-523, MCA, barred direct appeal. Harper, 235 Mont. at 44, 764 P.2d at 1285. Potentially, had the district court found Jan Harper in contempt as well as modified the Harpers' visitation and child support under one judgment, her petition for writ of certiorari may have been barred because the issuing court did not exceed its jurisdiction. In other words, if the court had the power to render the judgment, even if some portion of the judgment was in error, the judgment must stand. See generally State ex rel. Lay, 122 Mont. at 71, 198 P.2d at 766.*

¶37.Thus, one party's contemptuous conduct, under § 3-1-501, MCA, may lead to not only an order of contempt, but also an ancillary order that determines the rights of the parties as a result of the contemptuous conduct--all under one judgment--as is the case here. The ancillary order, nevertheless, may result from the proper exercise of the court's jurisdiction, and therefore a petition for certiorari would necessarily be denied. Therefore, we hold that the "family law" direct appeal exception established in our case law applies when, and only when, the judgment appealed from includes an ancillary order which effects the substantial rights of the involved parties. Consequently, we hold that a lone contempt order, regardless of the underlying law of the case, cannot be reviewed by this Court on direct appeal.

## II. Issues on Appeal

¶38.In the case *sub judice*, the District Court not only held Johnson in contempt, it also issued ancillary orders which affixed a dollar amount to property that should have been conveyed to Lee, required that Johnson compensate Lee for his acquired obligation to pay credit card debt discharged in Johnson's bankruptcy, and offset Lee's maintenance obligations. Further, Johnson's post-judgment motion that requested a $5,000 offset to the money judgment was deemed denied. Thus, substantial property rights are at issue, and we

therefore will review Johnson's direct appeal to determine whether the District Court acted within its jurisdiction, and whether the evidence supports the findings of the court. *See Sullivan*, 258 Mont. at 539-40, 853 P.2d at 1200. Accordingly, we recast and consolidate the issues raised by the parties as follows.

## *Issue 1.*

*Did the District Court lack or exceed its jurisdiction in this matter?*

¶39.Johnson claims that because the nature of the contempt order was criminal, rather than civil, she was entitled to greater due process, including a neutral judge, representation of counsel, a chance to testify and call witnesses, and a "beyond reasonable doubt" standard for finding guilt. She contends that because the District Court mistakenly treated her contempt as civil, rather than criminal, it did not have jurisdiction to issue what amounted to a criminal contempt order. She relies on our decision in *Kauffman v. Twenty-First Judicial District*, 1998 MT 239, 291 Mont. 122, 966 P.2d 715, which incidentally involved the same district court judge.

¶40.In *Kauffman*, we determined that in cases in which it is not necessary for a court to take instant action, whether the contempt is direct, pursuant to § 3-1-511, MCA, or indirect, pursuant to § 3-1-512, MCA, a contemnor is entitled to full due process. *Kauffman*, ¶ 33. We stated:

This includes a hearing before a neutral judge, during which the contemnor is advised of the charges against him or her, has a reasonable opportunity to meet them by way of defense or explanation, has the right to be represented by counsel, has a chance to testify and call other witnesses on his behalf, and, in instances in which criminal punishment is a consequence, a finding of guilt beyond a reasonable doubt.

*Kauffman, ¶ 33.*

¶41.Johnson correctly points out that if the court's purpose is to punish the contemnor for a specific act done and to vindicate the authority of the court, the contempt is "criminal." *Kauffman*, ¶ 17. This is in contrast to a sanction which attempts to force the violator's compliance with a court order, which is "civil" contempt. *See* § 3-1-519, MCA (providing that once adjudged guilty of contempt, a fine may be imposed not exceeding $500 or

imprisonment not exceeding 5 days, or both) *and compare with* § 3-1-520, MCA (stating that when the contempt consists in the omission to perform an act which is yet in the power of the person to perform, he may be imprisoned until he shall have performed it). It is the ability to end the imprisonment that is the distinguishing factor and why it is often said that in a civil contempt case one carries the keys to the jailhouse in his own pocket. *Kauffman*, ¶ 17. We agree with Johnson that her 24-hour incarceration, with no indication from the District Court that this sentence could be forestalled by action on her part, was "criminal" in nature. We conclude, however, that all of the foregoing due process requirements were met in this case, and therefore the District Court did not exceed its jurisdiction as to the contempt order.

¶42. First we conclude that Johnson's conduct clearly falls within the elements of § 3-1-501 (d), MCA, which the District Court cited and followed. Under this statute, "deceit or abuse of the process or proceedings of the court by a party to an action or special proceeding" is contempt of the authority of the court. At the very least, Johnson admitted at the show cause hearing that she had not complied with the court's 1996 dissolution decree and had by affidavit misled the court as to her possession of the horse and horse trailer. It was within the court's jurisdiction, therefore, to find Johnson in direct contempt pursuant to § 3-1-511, MCA, and order a penalty prescribed by § 3-1-519, MCA.

¶43. Even assuming there was no immediacy, in accordance with our decision in *Kauffman*, we nevertheless conclude that the due process requirements set forth in *Kauffman* were met. Here, in contrast to *Kauffman*, Lee, not the court, initiated the contempt hearing on April 20, 1998. The judge in this instance was therefore neutral to the civil matter before him, and did not rule on the contempt motion until the conclusion of the hearing. Johnson, who had been represented by counsel prior to the show cause hearing, elected to proceed *pro se*, and did not petition or otherwise request that the hearing be continued so that counsel could be obtained. At the hearing, she testified on her own behalf, and called several witnesses. Further, although the court did not expressly find that Johnson committed contemptuous acts "beyond a reasonable doubt," its ultimate decision was guided by Johnson's own admissions under oath that she had, indeed, disobeyed court orders and had misled the court in disposing of both the horse and horse trailer.

¶44. As for whether the court lacked jurisdiction due to this action being barred by a statute of limitations, we agree with the District Court that this argument is entirely without merit. In *Milanovich*, we held that the district court was without jurisdiction to hold the husband

in contempt because the wife had failed to file her show cause motion within one year of his denying her Christmas visitation in 1979, subject to a court-ordered custody agreement. *Milanovich*, 201 Mont. at 334, 655 P.2d at 964. We applied the one-year statute of limitations for misdemeanors, found under § 45-1-205(2)(b), MCA, to the judicial contempt statute, § 3-1-519, MCA, which provides penalties of up to $500 and five days in jail.

¶45.The visitation at issue in *Milanovich* was one particular incident which could only occur in December of 1979, and did not involve intervening action by the court. Here, Johnson's failure to comply with the order to transfer the horse and horse trailer to Lee, although far exceeding the initial 30-day deadline imposed by the court, was an ongoing omission up until the date of the show cause hearing. Furthermore, Lee's ability to execute on the horse and trailer was forestalled by a stay of execution issued by this Court in August of 1996 that ran until May of 1997. Lee filed a show cause motion for contempt one month later. This effort was delayed again in July of 1997 when Johnson filed for bankruptcy and served Lee with a stay of execution notice. *See* § 27-2-406, MCA, stating that "[w]hen the commencement of an action is stayed by injunction or other order of the court or judge or statutory prohibition, the time of the continuance of the injunction or prohibition is not part of the time limited for the commencement of the action." Finally, Johnson concealed from Lee as well as the court the fact that both the horse and the trailer had been sold, respectively in March of 1996 and May of 1997, a fact that Lee became fully aware of only after becoming involved with Johnson's bankruptcy proceedings, some time between September and December of 1997.

¶46.In light of the foregoing sequence of events, the contempt proceeding initiated by Lee was not barred by the statute of limitations, and the District Court therefore had jurisdiction to conduct the show cause hearing and render its judgment.

¶47.Similarly, Johnson's argument that the court lacked jurisdiction for an "examination of judgment debtor" proceeding is of no avail. Such a proceeding is a remedy provided for creditors following the return of an unsatisfied execution. Under § 25-14-101, MCA, "no judgment debtor who is a resident may be required to attend [the examination] before a judge or referee out of the county in which he resides." *See generally Belote v. Bakken* (1961), 139 Mont. 43, 46, 359 P.2d 372, 373. In issuing its order for the hearing, the court did not address Lee's "examination of judgment debtor" request; rather, it issued an order to show cause related to Lee's motion for contempt only, a matter over which it had jurisdiction. Ultimately, the judgment affected the rights of the parties pursuant to their

1996 dissolution decree, a matter over which the court had continuing jurisdiction.

¶48.Likewise we conclude that the court was within its jurisdiction when, at the stipulation of both parties, it affixed a final and definite sum to the parties' obligations under their 1996 dissolution decree. This sum included crediting Lee with an offset of both past and future maintenance obligations as well as reaffirming Johnson's credit card obligation under the decree that had been discharged in bankruptcy and subsequently shifted to Lee.

¶49.A court has continuing jurisdiction in matters of maintenance, support, property disposition and child custody. *See In re Marriage of Ensign* (1987), 227 Mont. 357, 361, 739 P.2d 479, 482. In his motion for contempt, Lee expressly requested that the court determine whether "any amounts which [Lee] may owe [Johnson] pursuant to the Decree of Dissolution have been discharged or offset by [Johnson's] actions in this matter." Under § 40-4-208(3)(b), MCA, a district court may modify property disposition in dissolution matters "if the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state."

¶50.Johnson is correct that under § 40-4-208(1), MCA, "modification" of a maintenance decree may only address "installments accruing subsequent to actual notice to the parties of the motion for modification." Following the rationale of *In re Marriage of Cowan*, however, we conclude that the court did not retroactively modify Lee's accrued maintenance obligation by either increasing or decreasing his obligation. Rather, the court merely changed the source of the payment, by reducing the dollar amount that Lee may execute against Johnson. *See In re Marriage of Cowan* (1996), 279 Mont. 491, 499-500, 928 P.2d 214, 220-21 (allowing a credit against a noncustodial parent's child support obligation for Social Security benefits received by his children). In this sense, Johnson will ultimately realize the full benefit of the maintenance awarded to her under the 1996 decree, and is not precluded from bringing a timely action to upwardly modify this maintenance as expressly provided in the 1996 decree.

¶51.Further, the District Court offset Lee's obligation to pay joint credit card debts, which resulted from the discharge of these debts in Johnson's bankruptcy proceedings. The court added $3,055 to the judgment in Lee's favor. Lee contends this offset was proper, due to the fact that the credit card companies in question have now held him solely responsible for debts that Johnson was originally ordered to pay under the 1996 dissolution decree. Johnson argues that federal courts have original and exclusive jurisdiction of all bankruptcy cases. Therefore, any clarification or modification of the bankruptcy court's

judgments would lie within the jurisdiction of the federal court, not a state district court. She further claims that *res judicata* prevents including the previously discharged debt in the District Court's judgment.

¶52.It is well established that a state district court has concurrent jurisdiction with a federal bankruptcy court to determine the issue of the dischargeability of debts pursuant to 11 U.S.C. § 523(a), other than those found under subsections (2), (4), and (6). *See* 28 U.S. C. § 1334(b); *In re Marriage of Yates* (1996), 280 Mont. 294, 298, 930 P.2d 644, 646; *State ex rel. Rough v. District Court* (1985), 218 Mont. 499, 502, 710 P.2d 47, 49. Even so, the court is bound to enforce the laws the United States under the Supremacy Clause. *See In re Beardslee* (Bankr.D.Kan. 1997), 209 B.R. 1004, 1009. A district court's failure to do so would result in it exceeding its jurisdiction.

¶53.Here, the District Court did not expressly apply bankruptcy law to the facts, or make any determination as to whether Johnson's bankruptcy discharge should be amended or modified. Rather, the discharged credit card debt of $3,055 was accepted as a fact, which both parties stipulated to. The court then determined, essentially, that although Johnson was relieved of *her* debt to the credit card companies through bankruptcy, she was still obligated for *Lee's* debt pursuant to the 1996 dissolution decree.

¶54.In review of the court's actions, we conclude that Johnson's discharge in bankruptcy simply did not embrace Lee's joint responsibility for the credit card obligation. The 1996 decree does not provide that either party must indemnify or hold harmless the other party. *See, e.g., In re Marriage of Craib* (1994), 266 Mont. 483, 497-98, 880 P.2d 1379, 1388 (providing example of enforceable indemnification agreement in dissolution decree). Thus, for the purposes of bankruptcy, Johnson was never in "debt" to Lee for the credit card obligation pursuant to the 1996 dissolution decree, which can be contrasted to her "debt" to him of the horse and trailer. *See In re Stegall* (Bankr.W.D.Mo. 1995), 188 B.R. 597, 598 (concluding that absent an indemnity or hold harmless provision, joint debt assumed by debtor under divorce decree property settlement did not create debt between debtor and former spouse); *accord In re Owens* (Bankr.E.D.Ky. 1996), 191 B.R. 669, 674; *In re Richardson* (Bankr.E.D.Ky. 1997), 212 B.R. 842, 846. Consequently, Johnson could not be relieved of Lee's obligation because it was not a "debt" that was discharged. *See Beardslee*, 209 B.R. at 1010.

¶55.We are mindful that district courts are given great discretion in dividing the marital estate in order to achieve a fair distribution of marital property using reasonable judgment

and relying on common sense. *In re Marriage of Kimm* (1993), 260 Mont. 479, 483, 861 P.2d 165, 168. Accordingly, we conclude that the District Court had jurisdiction to make the determination that Johnson may be held responsible to Lee for his credit card obligation pursuant to the 1996 dissolution decree, and that this determination conforms with federal bankruptcy law.

¶56. The District Court therefore did not lack or exceed its jurisdiction in determining the money judgment, which included offsetting Lee's maintenance and his obligation to joint credit card debt, pursuant to the 1996 dissolution decree. Having concluded that the court did not lack or exceed its jurisdiction in this matter, we now turn to the second prong of our review to determine whether the orders were supported by substantial evidence.

## Issue 2.

*Was there substantial evidence to support the District Court's July 15, 1998 judgment and orders?*

¶57. As stated above, Johnson admitted at the hearing that she had not complied with the 1996 dissolution decree, and that she had in fact sold the horse and trailer and disposed of the proceeds. We conclude the record offers substantial evidence supporting the District Court's conclusion that Johnson's conduct was contemptuous pursuant to § 3-1-501(d), MCA. *See Nevin*, 284 Mont. at 472, 945 P.2d at 61 (citations omitted).

¶58. We further conclude that the evidence supporting the District Court's calculation of the money judgment regarding the horse and trailer is substantial as well. The 1996 decree provided the stipulated value of the horse as well as the amount of Lee's obligation for maintenance. Johnson herself provided the 1997 price of the surreptitiously sold trailer, a figure which the court used upon stipulation by the parties.

¶59. Further, the credit card debt sum of $3,055 was derived directly from the 1996 decree. Johnson claims that the total should be $3,896.93, but does not provide evidence as to why this sum is correct and the court's figure of $3,055 is incorrect. Needless to say, it is to her advantage that she abide by the District Court's figure. We conclude the record evinces substantial evidence in support of the foregoing sums.

¶60. Johnson's request that the judgment be offset by $5,000, a sum received by Lee from a notary bonding company, was deemed denied by the District Court. Johnson contends that

Montana courts have consistently held that when a plaintiff receives payment, he is not entitled to an additional damage award under any legal theory. In relying on *Five U's, Inc. v. Burger King Corp.*, 1998 MT 216, 290 Mont. 452, 962 P.2d 1218, Johnson fails to distinguish the tort liability incurred by her father and his bonding company from the matter before the District Court.

¶61.According to Lee, he did not learn that his signature had been wrongfully notarized until he obtained a copy of the certificate of title from the Montana Department of Motor Vehicles. Independent of the show cause proceeding, Lee made a demand on the bond of the notary, pursuant to § 1-5-406, MCA, which provides: "[f]or the official misconduct or neglect of a notary public, he and the sureties on his official bond are liable to the parties injured thereby for all damages sustained." In turn, Lee was compensated. Under Johnson's theory, as expressed in *Five U's, Inc.*, if Lee brought further action against her father, any resulting money damages in turn would then be offset by the $5,000 in question.

¶62.However, Johnson's father was never a party in this action. *Five U's, Inc.* specifically addresses joint tortfeasors and their insurers, and is of no use to Johnson here. *See McWilliams v. Clem* (1987), 228 Mont. 297, 309, 743 P.2d 577, 585 (concluding that bonding company payment should be deducted from total amount of damages where notary is joint tortfeasor).

¶63.*Five U's, Inc.* does, however, provide the collateral source rule, which is applicable on principle here. The collateral source rule states that "benefits received by a plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Five U's, Inc.*, ¶¶ 16-19 (concluding that collateral source rule inapplicable to insurance payments received by plaintiffs from joint tortfeasor insurers) (citations omitted). Here, the judgment rendered pursuant to Lee and Johnson's dissolution decree is wholly independent of the action brought by Lee against the notary bond. Based on the substantial evidence pertaining to this issue, we conclude that the District Court properly denied Johnson's claim that her judgment should be offset by the $5,000 Lee received from his notary bond claim.

¶64.We therefore conclude there was substantial evidence to support the District Court's July 15, 1998 judgment and orders finding Johnson in contempt, and determining a money judgment in Lee's favor.

## *Issue 3.*

*Should Lee be awarded costs and attorney's fees for defending this appeal and should this Court hold Johnson in contempt?*

¶65.Lee requests that we award his costs and attorney fees incurred during this appeal, as well as hold Johnson in contempt. As Lee correctly asserts, pursuant to Rule 32, M.R.App. P., if this Court is "satisfied from the record and the presentation of the appeal in a civil case that the same was taken without substantial or reasonable grounds, such damages may be assessed on determination thereof as under the circumstances are deemed proper." *See Spoonheim v. Norwest Bank Montana, N.A.* (1996), 277 Mont. 417, 422, 922 P.2d 528, 531 (awarding fees and costs).

¶66.As a general rule, this Court will not impose sanctions pursuant to Rule 32, M.R.App. P., unless the appeal is entirely unfounded and intended to cause delay or unless counsel's actions otherwise constitute an abuse of the judicial system. *See In re Marriage of Moss*, 1999 MT 62, ¶ 41, 293 Mont. 500, ¶ 41, 977 P.2d 322, ¶ 41. However, we have awarded fees and costs in instances where one party has "previously conceded the propriety of [a] dismissal" and then nevertheless proceeded to appeal the dismissal as improper. *See Buck v. Billings Montana Chevrolet, Inc.* (1991), 248 Mont. 276, 287, 811 P.2d 537, 544. We have also awarded fees and costs where a party demonstrates a "significant disdain for the integrity of the judicial process." *Tipp v. Skjelset*, 1998 MT 263, ¶¶ 24, 29, 291 Mont. 288, ¶¶ 24, 29, 967 P.2d 787, ¶¶ 24, 29. Likewise, we have awarded fees and costs where a party proceeded on appeal based on inconsistent and conflicting positions. *Federated Mut. Ins. Co. v. Anderson* (1996), 277 Mont. 134, 145, 920 P.2d 97, 104. Finally, we have also stated that while pro se litigants may be given a certain amount of latitude in their proceedings, they may not proceed in such a fashion as to abuse the judicial process and prejudice the opposing party's interests. *See Federal Land Bank of Spokane v. Heidema* (1986), 224 Mont. 64, 68, 727 P.2d 1336, 1338.

¶67.Johnson ultimately received what she requested from the court at the show cause hearing. She stated that "my hope is that we can get a judgment for a final amount so this can be done." Moments later, the District Court calculated a fixed sum and Johnson as well as counsel for Lee stipulated to this amount. Johnson offered not one word regarding the inclusion of Lee's credit card obligation in the judgment. The court then denied Lee's request for attorney's fees, and in its own discretion decided against a monetary contempt, because Johnson already owed a "substantial amount of money" to Lee.

¶68.Obviously, Johnson then thought better of her acquiescence and appealed not only the contempt, but every element of the entire judgment, an action which further delayed a final judgment and resolution in this matter. Now, she requests that the judgment be reduced to $3,281 and that Lee bear his own costs and fees resulting from yet more litigation.

¶69.Although some of her legal arguments presented have merit, most are generally wanting of sound legal support. Further, she alternated between criminal and civil contempt positions on appeal to suit a particular argument. Aside from these factors, and more importantly, Johnson has once again been less than forthright with a tribunal. One glaring example of her failure to distinguish between opinion and fact is her repeated assertion that she "notified Dr. Lee by certified letter in June of 1997 that the property [horse and trailer] had been sold." The letter found in her brief's appendix says no such thing. Rather, the letter seemed to indicate that Johnson was willing to offer a cash settlement of $9,700, less maintenance, in lieu of transferring the horse and trailer. Likewise, Johnson also asserts that "Contrary to Dr. Lee's representation, the District Court's order to show cause also called for Lisa to appear for an examination of judgment debtor." The term "examination of judgment debtor" appears no where on the court's order to show cause. Such transgressions are akin to her 1996 affidavit to this Court in which she swore that the horse and trailer "are the only assets of substance that remain in my hands . . ." and that this property "cannot be replaced if distributed and sold during the pendency of this appeal."

¶70.We are satisfied from the record and the presentation of the appeal in this matter that Johnson proceeded here without respect for the integrity of the judicial process, and did so without sufficient reasonable grounds. We therefore conclude that Lee's request for reasonable fees and costs incurred in defending this appeal, pursuant to Rule 32, M.R.App. P., is appropriate, and is thereby awarded. We further conclude that the District Court's finding of contempt was sufficient punishment for Johnson's actions, and decline to sanction her further.

¶71.The judgment of the District Court is affirmed, and this matter is remanded for the sole purpose of determining the costs and fees associated with this appeal, and the entry of this award in Lee's favor.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART